# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2624

_____

| | | |
|---|---|---|
| Betty Lou Dossett, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| First State Bank, Loomis, Nebraska, | * | |
| | * | |
| Appellee. | * | |
| _____ | * | Appeal from the United States |
| | * | District Court for the |
| Betty Lou Dossett, | * | District of Nebraska. |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Lauritzen Corporation, doing business | * | |
| as Financial Services Company, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 16, 2004
Filed:  February 28, 2005

_____

Before MORRIS SHEPPARD ARNOLD, RILEY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Betty Lou Dossett brought this action pursuant to 42 U.S.C. § 1983 against her former employer, First State Bank of Loomis, Nebraska, ("Bank") and the Lauritzen Corporation ("Lauritzen"). Dossett claimed that the defendants conspired with the Loomis School District ("School District") to terminate her employment at the Bank in retaliation for her exercising the constitutional right to freedom of speech at a public school board meeting. Dossett appeals several decisions made by the district court in the trial and re-trial of her case. We affirm in part, reverse in part, and remand for a new trial.

I.

Dossett is a resident of Holdredge in Phelps County, Nebraska. In February 1994, she began working at the Bank, where she "did a little bit of everything," including serving as a teller and bookkeeper. On January 15, 1998, Dossett attended a public meeting held by the Phelps County R-6 School District where the issue of merging with the Loomis School District was discussed. At the meeting, she inquired why no one from the Loomis School District had informed the public about potential tax consequences of the proposed merger.

The Loomis School District was one of the Bank's largest deposit accounts. After the meeting, the Loomis School District superintendent and two members of the Loomis school board spoke about the meeting with employees of the Bank, including the president of the Bank, John Nelsen. The superintendent, Keith Fagot, who also had his personal bank accounts at the Bank, informed Nelsen that he felt Dossett inappropriately had questioned his integrity and the integrity of the Loomis school board members. As a result, Fagot said that he would wait for another teller when visiting the Bank in order to avoid contact with Dossett. Nelsen believed that as superintendent, Fagot had the power to direct the School District's funds elsewhere. Nelsen also heard that school board member Nancy Morse, who maintained a personal account at the Bank, was upset by Dossett's remarks at the meeting. School

board member Mike Thorell, a prospective customer of the Bank, also informed Nelsen that he was offended by Dossett's comments and would not be comfortable with her waiting on him as a teller.

Nelsen reported the problem relating to Dossett to Dan O'Neill, the executive vice president of Lauritzen and president of Financial Services Company, a division of Lauritzen. O'Neill testified that Nelsen told him that several customers had threatened to change banks or sever their relationships with the Bank because of Dossett's remarks. Nelsen denied that any of the school board members or the superintendent threatened to remove funds from the Bank or demanded that Dossett be fired. Ultimately, on January 29, 1998 – two weeks after the public meeting regarding the merger – Nelsen terminated Dossett's employment. At the termination meeting, Nelsen informed Dossett that as a result of her comments, the Bank was on the verge of losing two large depositors and loan customers. In a letter, Nelsen further advised Dossett that her employment was terminated because of "comments made by [her] during a meeting on January 15, 1998, which were negative about our local school board and superintendent, thereby reflecting poorly on our community and placing at risk substantial customers of the Bank."

At the end of a first jury trial, the jury returned a verdict in favor of Dossett in the amount of $1,555,678.76. The day after the verdict, the district court *sua sponte* notified the parties that it was considering the grant of a new trial on both liability and damages, because the court tentatively believed the verdict was excessive and the product of passion and prejudice. After briefing and argument, the court ordered a new trial. With regard to the first trial, Dossett appeals the district court's decisions granting a new trial, granting defendant Lauritzen's motion for judgment as a matter of law, and denying Dossett's request for a punitive damages instruction.

After a second trial, the jury returned a verdict in favor of the Bank. Dossett claims that one of the key jury instructions was erroneous. She complains about an

instruction that required her to prove in her First Amendment retaliation claim that the School District superintendent and board members, who allegedly conspired with the Bank, had "actual authority" or "apparent authority" as agents of the School District to enter into an agreement with the Bank to discharge Dossett in retaliation for the comments she made at the school board meeting. Moreover, Dossett claims that she was entitled to further discovery on this element of actual or apparent authority, and that the district court erred in conditioning further discovery on her payment of the Bank's costs in preparing for trial. In addition, Dossett contends that the district judge erred in denying her motion for recusal, a request for a punitive damages instruction, and a motion for a new trial.

## II.

At the conclusion of Dossett's case-in-chief in the first trial, on February 11, 2003, the district court entered judgment in favor of Lauritzen pursuant to Federal Rule of Civil Procedure 50(a). When the district court granted a new trial with respect to claims against the Bank on February 28, 2003, it stated that for purposes of Federal Rule of Civil Procedure 54(b), there was no just reason to delay entering a final judgment dismissing with prejudice all claims against Lauritzen. At that point, there was indisputably a final judgment subject to appeal, but Dossett did not file her notice of appeal in this case until June 6, 2003. As a result, Dossett's notice of appeal with respect to Lauritzen was untimely under Federal Rule of Appellate Procedure 4(a)(1)(A), because it was not filed within 30 days after the district court entered judgment in favor of Lauritzen. *See Speer v. City of Wynne*, 276 F.3d 980, 988 (8th Cir. 2002). Accordingly, we lack jurisdiction to address Dossett's claim that the district court erred in granting judgment as a matter of law in favor of Lauritzen. *See Browder v. Dir., Dep't of Corrs. of Ill.*, 434 U.S. 257, 264 (1978) (time limit set forth in Federal Rule of Appellate Procedure 4 regarding when to file a notice of appeal is "mandatory and jurisdictional").

-4-

After the first trial, the district court advised the parties that the court was considering an order for a new trial on its own motion pursuant to Federal Rule of Civil Procedure 59(d). After consideration of the parties' briefs and oral arguments, the court ordered a new trial on Dossett's First Amendment claim. Relying on *Sanford v. Crittenden Memorial Hospital*, 141 F.3d 882, 884-86 (8th Cir. 1998), the district court granted a new trial because the verdict of $1,555,678.76 was "excessive" and "the finding of liability and the award of damages was the product of passion and prejudice." (J.A. at 183). Under our precedents, review of the district court's decision to grant a new trial based on the size of the verdict is "extraordinarily deferential," in view of the opportunity of the district court to hear the testimony, observe the demeanor of the witnesses, and know the community and its standards. *Sanford*, 141 F.3d at 884; *see also Solomon Dehydrating Co. v. Guyton*, 294 F.2d 439, 447-48 (8th Cir. 1961).

We cannot say that the district court abused its discretion in finding that the jury's verdict of over $1.5 million was excessive and a product of passion and prejudice. The jury was instructed to base any award only on actual damages, which in this case included lost wages and "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and reputation damage." (J.A. at 155). The jury was not instructed to consider punitive damages. Because the parties stipulated that the amount of Dossett's lost wages was $55,678.76, (*id*. at 513), it follows that the jury awarded Dossett exactly $1.5 million for pain, suffering, and other non-economic damages. Even Dossett's attorney was not so bold as to argue for anything close to that sum. During closing arguments, he urged only a total of $500,000 in damages.

The first jury's award, as far as we can tell, would represent an unprecedented amount of damages in a First Amendment retaliation case. Dossett has not identified

any comparable award, and our precedents generally involve damages well below the seven-figure sum at issue here. *See*, *e.g.*, *Naucke v. City of Park Hills*, 284 F.3d 923, 926-27, 930 (8th Cir. 2002) (upholding award of $8,542 in back pay, $50,000 for emotional distress, and $100,000 for punitive damages for a fired chief of the fire department, and $6,750 in back pay, $10,000 for emotional distress, and $30,000 in punitive damages for a fired part-time fireman); *Campbell v. Ark. Dep't of Corr.*, 155 F.3d 950, 957 (8th Cir. 1998) ($94,000 for back pay, mental and emotional distress, humiliation, and loss of reputation); *Casey v. City of Cabool*, 12 F.3d 799, 802 (8th Cir. 1993) ($18,888 in damages); *Trudeau v. Wyrick*, 713 F.2d 1360, 1368 (8th Cir. 1983) ($25,000 in actual damages was not excessive). Dossett argues that her case is comparable to *Rustenhaven v. American Airlines, Inc.*, 320 F.3d 802 (8th Cir. 2003), in which the jury awarded $4,242,000 to a plaintiff who survived a plane crash and suffered physical and various cognitive injuries. *Id*. at 804. But while our court concluded that the evidence of mental and emotional consequences was sufficient to support an award of $3,242,000 (after remittitur), we emphasized that the non-economic damages were the result of physical injuries sustained in a traumatic, life-threatening accident. *Id.* at 807-09. The factual scenario presented in *Rustenhaven* is so different from the case at hand that the district court was well within its discretion to measure the reasonableness of Dosset's damages award differently from Rustenhaven's. Although Dossett did experience a tumultuous period after losing her job, it was not an abuse of discretion to find that an award for non-economic damages of almost twenty-eight times her lost wages was excessive.

Dossett also argues that even if the jury award was the product of passion and prejudice, the district court should not have granted a new trial on the issue of liability, or, alternatively, that the court should have offered her a remittitur. It is "generally inappropriate," however, to order only a partial new trial on the issue of damages when the district court concludes the damages award was motivated by passion and prejudice. *Sanford*, 141 F.3d at 885. We have reasoned that if passion or prejudice influenced the jury's damages decision, then that same passion or

prejudice may well have affected its decision on the issue of liability as well. *Id.* For similar reasons, absent unusual circumstances, a remittitur is not appropriate when there is a finding of passion or prejudice. *Id.*; *Everett v. S.H. Parks & Assocs., Inc.*, 697 F.2d 250, 253 n.5 (8th Cir. 1983). Finding no unusual circumstances here, we hold that the district court did not abuse its discretion in granting a new trial with respect to damages and liability and refusing to offer a remittitur.

IV.

In the second trial, the claim tried to the jury was Dossett's allegation that the Bank and the School District conspired to have her terminated for exercising her First Amendment rights at the R-6 school board meeting, and that the Bank was liable for that conspiracy under 42 U.S.C. § 1983. This claim was premised on the Supreme Court's recognition that a private actor may be liable under § 1983 when the private actor "'is a willful participant in joint activity with the State or its agents'" in denying a plaintiff's constitutional rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)); *see also Tower v. Glover*, 467 U.S. 914, 920 (1984) ("[A]n otherwise private person acts 'under color of' state law when engaged in a conspiracy with state officials to deprive another of federal rights."); *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980). The jury ultimately returned a verdict in favor of the Bank.

Dossett's principal claim on appeal relates to the district court's jury instruction concerning the elements of her § 1983 claim. Section 1983 imposes liability for certain actions taken "under color of" law that deprive a person "of a right secured by the Constitution and laws of the United States." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 931 (1982) (internal quotation omitted). A deprivation of rights secured by the First Amendment – against the States by way of the Fourteenth Amendment – requires state action, *see United Bhd. of Carpenters Local 610 v. Scott*, 463 U.S. 825, 830-32 (1983), and "[i]n cases under § 1983, 'under color' of law has consistently

been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 928 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)). Whether the school superintendent and other school board members acted under color of law or in their purely private capacities as bank customers during interaction with the Bank was sharply contested at trial. Dossett asserts that the district court's instruction on this element of her claim was error.

Because Dossett claimed that the Bank was liable under § 1983 pursuant to the "joint action" theory of *Adickes*, the district court instructed the jury that for Dossett to prove her claim, she must establish that "there was a voluntary understanding, or willing meeting of the minds, between Defendant and the Loomis School District that Defendant would discharge Plaintiff in retaliation for the comments made by Plaintiff at the R-6 school meeting." (J.A. at 737.) With regard to the role of the school officials, the district court advised the jury that it "must find that the superintendent or one or more members of the school board of the Loomis School District had either 'actual authority' or 'apparent authority' as agents of the District to enter into the understanding or meeting of the minds."[1] During the jury instruction conference, the

---

[1]Jury Instruction No. 9 stated:

> Third, there was a voluntary understanding, or willing meeting of the minds, between Defendant and the Loomis School District that Defendant would discharge Plaintiff in retaliation for the comments made by Plaintiff at the R-6 school meeting.

> Before you may find that there was such an understanding or meeting of the minds, you must find that the superintendent or one or more members of the school board of the Loomis School District had either "actual authority" or "apparent authority" as agents of the District to enter into the understanding or meeting of the minds.

> "Actual authority" exists when an agent acts within the scope of

-8-

district court explained that it adopted this instruction to make the issue of "state action" more "sensible to the jury . . . [b]y using actual authority and apparent authority as opposed to magic words state action and that sort of thing." (Trial Tr. 5/22/03, at 445).

------

his or her authority. The conduct of an agent is within the scope of his or her authority:

      1. When it is the kind of thing he or she was employed or elected to do;

      2. When it is done substantially within any authorized limits on time and place; and

      3. When it is done with at least the partial intention of furthering the interests of his or her principal (in this case, the Loomis School District).

      For "apparent authority" to exist in this case,

      1. The Loomis School District must have led Defendant to believe that its superintendent or one or [sic] members of the school board had authority to agree that Defendant would discharge Plaintiff in retaliation for the comments made by Plaintiff at the R-6 school meeting; and

      2. Defendant's belief that the superintendent or one or more school board members had this authority must have been reasonable.

      If Plaintiff fails to prove any one of the three essential elements of her First Amendment claim, your verdict must be for the Defendant.

(J.A. at 737-38).

Dossett contends that this jury instruction was erroneous because it required her to prove that the school board members or superintendent had official authority to enter into an understanding that Dossett should be fired in retaliation for exercising her First Amendment rights. Dossett contends that the district court instead should have given the model Eighth Circuit jury instruction on "color of state law" – "[a]cts are done under color of law when a person acts or purports to act in the performance of official duties under any state, county or municipal law, ordinance or regulation," *8th Cir. Civil Jury Instr.* 4.40 (2001) – which, ironically, was the instruction requested by the Bank on this point. (Trial Tr. 5/22/04, at 443). We review the district court's jury instructions for abuse of discretion, making sure that they fairly represent the evidence and applicable law. *Warren v. Prejean*, 301 F.3d 893, 900 (8th Cir. 2002).

Under the instruction given to the jury, Dossett was required to prove that the school board members or the superintendent had "authority" – actual or apparent – to enter willingly into an understanding with the Bank to terminate Dossett in retaliation for the exercise of her First Amendment rights. As defined, school officials had "actual authority" only if an action was "the kind of thing he or she was employed or elected to do" and an official had "apparent authority" only if the Bank was led to believe that the school official "had authority" to make the agreement to retaliate against Dossett, and it was "reasonable" for the Bank to believe that the school officials had this authority. In other words, if the school officials acted in a way that a reasonable person would believe was outside the official's authority from the School District, then the school officials were not acting "under color of law" within the meaning of the jury instructions.

We agree with Dossett that the disputed instruction was error, because it excluded from the scope of "under color of" law actions taken by a school official who was purporting to act in the performance of official duties, but was acting outside what a reasonable person would believe the school official was authorized to

do.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).  At the same time, however, the Supreme Court has made clear that even the "[m]isuse of power" possessed by virtue of state law is action taken "under color of state law."  *Classic*, 313 U.S. at 326.  Thus, "under 'color' of law" means "under 'pretense' of law," and "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority *or overstep it*."  *Screws v. United States*, 325 U.S. 91, 111 (1945) (plurality opinion) (emphasis added); *accord id*. at 115-16 (Rutledge, J., concurring in the result).  Applying these principles, the Supreme Court in *Adickes* held that the involvement of a police officer in a conspiracy to deprive a citizen of equal protection of the laws "plainly provides the state action essential to show a direct violation of petitioner's Fourteenth Amendment equal protection rights, *whether or not the actions of the police were officially authorized, or lawful*."  398 U.S. at 152 (emphasis added).

That is not to say that every action of a school official is under color of law simply because the official is a public employee.  "[A]cts of officers in the ambit of their personal pursuits are plainly excluded," *Screws*, 325 U.S. at 111, so exhortations or agreements by a bank customer who also happens to be a school official do not necessarily constitute actions under color of law.  But on the other hand, the mere fact that a school official also has a personal account at the Bank does not mean that the official's interactions with the Bank are exempt from scrutiny under § 1983.  "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."  *West*, 487 U.S. at 50.  Hence, as noted, one of the fighting issues in this case has been whether school officials acted in their personal or official capacities when communicating with the Bank about Dossett.

-11-

The challenged jury instruction unduly narrowed the official capacity or "under color of law" side of this equation. If the jury believed that a school official, purporting to act in the performance of official duties, sought an agreement with the Bank to terminate Dossett in retaliation for the exercise of her First Amendment rights, but the jury believed that the school official's actions were both unauthorized and beyond those the Bank reasonably believed were authorized by the School District, then the jury was directed to find that the school official was not acting under color of law. This is not a correct application of the law. Just as a police officer conspiring to obtain a search warrant based on false evidence, *see Mark v. Furay*, 769 F.2d 1266, 1273-74 (7th Cir. 1985), or a judge agreeing to issue an injunction in exchange for a bribe, *Sparks*, 449 U.S. at 26-28 & n.5, may act under color of law despite exceeding his actual and apparent authority as defined in these instructions, a school official reaching a mutual understanding with a private actor to retaliate against a private citizen for questioning the work of the school board may do the same. Accordingly, we conclude that the jury instruction defining the elements of the § 1983 conspiracy was erroneous. By eliminating one potentially viable avenue to establish liability, the error affected Dossett's substantial rights. *See* Fed. R. Civ. P. 61.

V.

The Bank argues alternatively that even if the jury instruction was erroneous, the judgment should be affirmed on the ground that a private employer cannot be liable for violating the First Amendment rights of an employee based on "joint action" with a state actor under *Adickes*. The Bank observes that whether a public employee's speech is protected by the First Amendment is subject to a balancing test. *See Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968). It contends that in the case of a private employer alleged to have conspired with a state actor to retaliate against a private employee for the exercise of First Amendment rights, the *Pickering*

-12-

balance should be applied, and "any balancing must be decided in favor of the private employer." (Appellee's Br. at 34). The district court rejected this contention.

We agree with the district court that the Supreme Court's decision in *Pickering* is not applicable in this situation. *Pickering* concerned speech on matters of public concern by a public school teacher, and the Court recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." 391 U.S. at 568. The Court thus reasoned that "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id*. Dossett, by contrast, was not a public employee. She was a member of "the citizenry in general," and her speech on matters of public concern clearly was protected by the First Amendment against abridgment by state actors, without regard to a *Pickering* "balancing test."

We see no reason why a private actor may not be liable under § 1983 for conspiring with state officials to violate a private citizen's right to freedom of speech under the First Amendment, just as it may be held liable for conspiring to violate other constitutional rights. *See*, *e.g.*, *Hudson v. Chi. Teachers Union Local No. 1*, 743 F.2d 1187, 1191 (7th Cir. 1984) ("[W]hen a public employer assists a union in coercing public employees to finance political activities, that is state action; and when a private entity such as a union acts in concert with a public agency to deprive people of their federal constitutional rights, it is liable under section 1983 along with the agency."). In *Pendleton v. St. Louis County*, 178 F.3d 1007 (8th Cir. 1999), we said that "retaliation against protected speech can result in section 1983 liability even if it ultimately is carried out by a private actor." *Id*. at 1011. We held that the plaintiff in that case stated a claim against state defendants for conspiring to deny constitutional rights, because he alleged a meeting of the minds between the private

employer, who allegedly forced the plaintiff to resign, and a state actor who allegedly contacted the private employer in an effort to have the plaintiff terminated. Although the private employer was not a party to the interlocutory appeal, it is clear that a private entity acts under color of state law when engaged with state officials in a conspiracy to deprive a person of federal constitutional rights. We think it follows from *Pendleton* that both state officials and private actors may be liable under § 1983 for conspiring to retaliate against protected speech, if the evidence shows the requisite agreement to violate or disregard the law.

In support of its argument that the *Pickering* balancing test should apply to this case, the Bank complains that if Dossett were to prevail, then "a private employer faced with potentially devastating loss of business could not take the only action that would save its business." (Appellee's Br. at 34). We think this cataclysmic prediction misunderstands Dossett's claim. The allegation is not merely that the Bank discharged Dossett because it exercised business judgment in the best interests of its shareholders, or that it succumbed to economic pressure from school officials who threatened to withdraw the school board's significant bank account. If that were all the evidence showed, then it may well be insufficient to establish liability for a conspiracy under § 1983. *Cf. Helvey v. City of Maplewood*, 154 F.3d 841, 844-45 (8th Cir. 1998) (holding that, although private employer told plaintiff employee "[t]he City says I have to fire you," and the "City will revoke [my] license and put [me] out of business unless [I] fire [you]," employee "offered no evidence" that private employer "willingly agreed" with city manager to retaliate against her for testifying in court proceeding, and thus dismissing claims under 42 U.S.C. § 1985 and state civil conspiracy law).

Under § 1983, a plaintiff must establish not only that a private actor caused a deprivation of constitutional rights, but that the private actor willfully participated with state officials and reached a mutual understanding concerning the unlawful objective of a conspiracy. *See Adickes*, 398 U.S. at 152. In *Adickes*, for example, the

-14-

Supreme Court considered whether Kress & Company was entitled to summary judgment on the claim that it had conspired with city police to violate the plaintiff's equal protection rights when Kress refused service at a food counter. Kress argued that summary judgment was warranted because evidence of its store manager's non-discriminatory motive for refusing service was undisputed. The store manager claimed that Miss Adickes was refused food service "only because he was fearful of a riot in the store by customers angered at seeing a 'mixed group' of whites and blacks eating together." 398 U.S. at 154. The Court rejected that argument, noting that the plaintiff presented evidence "specifically disputing the manager's assertion that the situation at the store at the time of the refusal was 'explosive,' *thus creating an issue of fact as to what his motives might have been* in ordering the refusal of service." *Id.* at 157 (emphasis added). The Court explained that the store manager's intent and motive were important to the question whether the store was liable under § 1983: "[Adickes] will be entitled to relief under § 1983 if she can prove that a Kress employee, in the course of employment, and a Hattiesburg policeman somehow *reached an understanding* to deny Miss Adickes service in the Kress store, or to cause her subsequent arrest *because* she was a white person in the company of Negroes." *Id.* at 152 (emphasis added); *see also DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999) ("The key inquiry is whether the private party was a willful participant in the corrupt conspiracy.").[2]

_____

[2]*See also United Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546 (9th Cir. 1989) (en banc) (A disputed issue of material fact existed as to whether private actor conspired to violate civil rights of strikers where a reasonable jury could infer that company's actions were designed not only to protect workers and property, but "reflect[ed] *an intent to punish the strikers. . . .* This evidence . . . goes to the most critical issue in the case: whether Phelps Dodge *intended* to violate the strikers' civil rights.") (emphasis added); *id.* at 1548-50 (Trott, J., dissenting); *Fonda v. Gray*, 707 F.2d 435, 438-39 (9th Cir. 1983) ("To prove a conspiracy between private parties and the government under § 1983, an agreement or 'meeting of the minds' *to violate constitutional rights* must be shown," and § 1983 claim failed where plaintiff "did not produce evidence of the existence of a 'meeting of the minds' between the banks and

In this case, Dossett alleges that the Bank shared an unlawful objective with the school officials. She asserts that the Bank willfully participated with school officials to terminate her *in retaliation for her exercise of First Amendment rights*. Although there was a good deal of evidence suggesting that the bank president was primarily concerned that Dossett's continued employment jeopardized the Bank's ability to retain the school district's substantial bank account and other accounts, Dossett also elicited testimony that "the basic reason" the Bank dismissed Dossett was "the content of what she said at the school board meeting." (Trial Tr. 5/21/03, at 243). The Bank's termination letter stated that Dossett was dismissed as a result of comments she made during a school board meeting, "which were negative about our local school board and superintendent, thereby *reflecting poorly on our community* and placing at risk substantial customers of the Bank." (J.A. at 763) (emphases added). The district court concluded that there was a submissible issue as to whether school officials and the Bank agreed to retaliate against Dossett, (Trial Tr. 5/22/03, at 446), and the Bank does not contest this point on appeal. As discussed, the Bank's submission on appeal is a broader claim that as a matter of law, a private employer may never be liable under § 1983 for conspiring to violate the First Amendment rights of a private employee, and we reject that proposition for the reasons stated.

---

the FBI *to knowingly attempt to accomplish an alleged wrongful purpose*, a necessary element of her conspiracy claim.") (emphasis added); Kevin F. O'Malley, et al., *Federal Jury Practice and Instructions* § 167.31 (5th ed. 2001) (providing that in claim of conspiracy to interfere with civil rights, "it must be shown by a preponderance of the evidence that the conspiracy was knowingly formed, and that the defendant who is claimed to have been a member knowingly participated in the unlawful plan *with the intent to advance or further some object or purpose of the conspiracy*") (emphasis added); *cf. Norton v. Liddel*, 620 F.2d 1375, 1379 (10th Cir. 1980) ("[W]here a private individual actively conspires with an immune State official (acting under color of law) *with the intent to purposely and knowingly deprive an individual of his rights* secured under the Constitution and laws of the United States, the fact that the State official is immune from suit in damages should not provide a windfall defense to the private conspirator.") (emphasis added).

-16-

VI.

Dossett also appeals the district court's denial of her motion for recusal, which she filed after the district court ordered a new trial and revised the jury instructions. A judge should recuse himself if his "impartiality might reasonably be questioned." 28 U.S.C. § 455. Dossett argues that the district judge projected an appearance of partiality when he granted a new trial on his own initiative, circulated his own set of jury instructions that revised the elements of Dossett's § 1983 conspiracy claim, denied Dossett's requests for a continuance for further discovery in light of the new jury instruction, rejected an instruction on punitive damages, and refused to permit discovery regarding the Bank's claim of reliance on counsel in defense of punitive damages. Dossett also asserts that the trial judge "assisted" the Bank's counsel by advising him of the ramifications of a particular line of questioning for waiver of the attorney-client privilege, prompting counsel for the Bank to withdraw the question to avoid waiving the privilege.

The district court's denial of a recusal motion is committed to its sound discretion, and we review that decision only for abuse of discretion. *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (en banc). Recusal is required when an average person knowing all the relevant facts of a case might reasonably question a judge's impartiality. *Id.* The crux of Dossett's claim is that the district judge's adverse rulings on several key issues demonstrate partiality or bias toward the Bank. Adverse judicial rulings, however, "almost never" constitute a valid basis for recusal; the proper recourse for a dissatisfied litigant is appeal. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *accord Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 665-66 (8th Cir. 2003).

We find no basis in the record to conclude that the district judge showed "a deep-seated favoritism or antagonism that would make fair judgment impossible."

*Liteky*, 510 U.S. at 555.[3]  The district court's actions in this case are not even in the same realm as the judicial partiality that arose in *United States v. Singer*, 710 F.2d 431, 435-36 (8th Cir. 1983), upon which Dossett relies, where we ordered recusal when the judge guided counsel for the government through almost every element of the trial and admitted in front of the jury that he was helping the government try its case.  The district court did not abuse its discretion in denying the motion for recusal, and we have no reason to believe that the district court will conduct future proceedings in this matter with anything other than judicious impartiality.

VII.

Dossett next contends that the district court erred by denying her request for a jury instruction on punitive damages.  Although Dossett frames the issue as an objection to the court's jury instructions, in substance she objects to the district court's grant of the Bank's motions for judgment as a matter of law on her punitive damages claims.  (Trial Tr. 2/11/03, at 345; Trial Tr. 5/22/03, at 436).  We review de novo a district court's grant of a judgment as a matter of law. *Standley v. Chilhowee R-IV Sch. Dist.*, 5 F.3d 319, 323 (8th Cir. 1993).  Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). Like the district court, we do not make credibility determinations or weigh the evidence, and we draw all reasonable inferences in favor of the non-moving party. *Standley*, 5 F.3d at 323.

---

[3]With regard to Dossett's claim that the district court "assisted" the Bank's counsel regarding a matter involving potential waiver of the attorney-client privilege, it is evident to us that the court anticipated a potential controversy over "difficult issues about the extent of waiver," (Trial Tr. 2/11/03, at 176-77), and thus raised the matter with counsel in advance as part of an effort to manage the trial.  We disagree with Dossett's contention that the court's action evinces favoritism requiring recusal.

Under § 1983, a jury may assess punitive damages "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). To support her claim of callous indifference, Dossett relies on the testimony of John Nelsen, the president of the Bank, who stated that an employee's rights to free speech were limited if the speech harmed her employer's business. This evidence does not rise to the level of reckless or callous indifference to constitutional rights. Indeed, absent willful participation in "joint action" with state officials to retaliate for the exercise of constitutional rights, the Constitution does not prevent the Bank, as a private actor, from terminating an employee's at-will employment if her public speech would damage the financial interests of the Bank. *See Manson v. Little Rock Newspapers, Inc.*, 200 F.3d 1172, 1173 (8th Cir. 2000).

In this case, it is undisputed that the Bank explored its options with counsel and other persons in the banking industry for two weeks before deciding that Dossett should be terminated. The legal issues are difficult, and the Bank's potential liability under § 1983 turns on subtle questions concerning its intent and motivation in terminating Dossett, and whether it reached a "meeting of the minds" with school officials to violate Dossett's constitutional rights. Even assuming a jury were to find that the Bank engaged in unlawful joint action with school officials, we do not believe the record supports a finding that its conduct was so callous as to warrant an award of punitive damages. Accordingly, we uphold the judgment as a matter of law dismissing Dossett's claim for punitive damages.

\*　　\*　　\*

In sum, we dismiss Dossett's appeal with respect to Lauritzen because her notice of appeal was untimely. We affirm the district court's grant of a new trial after the first jury verdict, its judgment as a matter of law for the Bank on Dossett's claim for punitive damages, and its denial of the motion for recusal. We reverse the

judgment for the Bank on Dossett's § 1983 conspiracy claim after the second trial, and remand for further proceedings consistent with this opinion.

_____