# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3018

_____

| | | |
|---|---|---|
| Ruzicka Electric and Sons, Inc.; | * | |
| Thomas R. Ruzicka, | * | |
| | * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| International Brotherhood of Electrical | * | |
| Workers, Local 1, AFL-CIO, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: April 14, 2005
Filed: October 11, 2005 **(Corrected 10/19/05)**

_____

Before WOLLMAN, HANSEN, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Ruzicka Electric and Sons, Inc. (Ruzicka Electric) sued Local 1 of the International Brotherhood of Electrical Workers ( Local 1) under section 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 187, alleging Local 1 engaged in unlawful secondary activity, in violation of 29 U.S.C. § 158(b)(4)(ii)(B). Ruzicka Electric also brought state law defamation claims against Local 1 for statements made by its agents questioning the quality of Ruzicka Electric's work. Thomas Ruzicka (Ruzicka), Ruzicka Electric's president and founder, individually

brought a state law invasion of privacy claim against Local 1 based on the conduct of private investigators hired by Local 1 to surveil Ruzicka. After Ruzicka Electric and Ruzicka presented their claims to a jury, the district court granted judgment as a matter of law to Local 1 on all claims. Ruzicka Electric and Ruzicka appeal, claiming the district court erred in dismissing Ruzicka Electric's section 303 claims; dismissing Ruzicka Electric's defamation claims; dismissing Ruzicka's invasion of privacy claim; not allowing Ruzicka Electric to present evidence about its claim that Local 1 engaged in secondary activity at a job site not listed in Ruzicka Electric's complaint; and admitting Local 1's evidence about administrative proceedings involving Ruzicka Electric. We affirm in part and reverse in part. Specifically, we remand for a new trial on Ruzicka Electric's section 303 claims and Ruzicka's invasion of privacy claim, and we affirm the district court in all other respects.

## I.    BACKGROUND

Because we are reviewing the district court's grant of judgment as a matter of law to Local 1, we do not make credibility determinations or weigh the evidence; instead, we draw all reasonable inferences in favor of Ruzicka Electric and Ruzicka. Dossett v. First State Bank, 399 F.3d 940, 954 (8th Cir. 2005). Therefore, we will summarize the evidence adduced at trial under that standard.

Ruzicka Electric, a Missouri corporation founded and headed by Ruzicka, provides commercial electrical services. Local 1 is a labor union representing electricians in eastern Missouri. Ruzicka Electric and Local 1 do not have a history of friendly relations. Over the years, Local 1 has publicized its area standards dispute with Ruzicka Electric by using pickets and handbills. This case addresses whether Local 1's conduct in its dispute with Ruzicka Electric violated federal or state laws.

## A.    Lindenwood University Project

In February 2001, Lindenwood University (Lindenwood) hired Ruzicka Electric to perform electrical work on a student center.  On April 17, Local 1 sent letters to Lindenwood and Ruzicka Electric notifying them of Local 1's area standards dispute with Ruzicka Electric, and that Local 1 intended to engage in area standards picketing at the Lindenwood job site to publicize Local 1's belief that Ruzicka Electric pays its non-union employees "substandard wages and fringe benefits." Local 1 assured Lindenwood and Ruzicka Electric it did not have a dispute with Lindenwood; it did not seek to remove Ruzicka Electric from the job or have work reassigned; it did not seek "to cause anyone to cease doing business with anyone else"; it would not interfere with work conducted at the job site; and the picket would be legal and peaceful.  Lindenwood later established a dual gate system at the job site, with a reserved gate to be used by Ruzicka Electric and its suppliers, and a neutral gate to be used by neutral contractors who were not part of the area standards dispute.  From June to October, Local 1 picketed and distributed handbills at the Lindenwood job site.

On July 18, Local 1 received information that led it to believe Ruzicka Electric had tainted the neutral gate by accepting deliveries through that gate rather than the reserve gate.  In response, Local 1 "decided to go ahead and put a picket [at the neutral gate] because we felt that the deliveries were for Ruzicka Electric and they had in our opinion violated the neutral gate."  Local 1 picketed the neutral gate on July 18 and 19.  Picketing the neutral gate resulted in "other trades [deciding] not to enter the project."

Also on July 18, Julie Mueller (Mueller), Lindenwood's Chief Operations Officer, faxed a letter to Local 1 advising Local 1 no electrical deliveries had been made to Ruzicka Electric through the neutral gate, informing Local 1 another electrical contractor besides Ruzicka Electric was conducting business on the premises, and "urg[ing Local 1 to] cease picketing against Ruzicka" Electric at the

neutral gate. The letter also informed Local 1 that failure to cease picketing would result in Lindenwood taking "all appropriate measures to stop your illegal activity." Local 1 claims it was not aware of Mueller's letter at the time.

On the morning of July 19, the general contractor for the Lindenwood project informed Local 1 the electrical deliveries made through the neutral gate were going to another electrical contractor, and not to Ruzicka Electric. After briefly investigating, Local 1 discovered another electrical contractor was on-site, and decided to remove the picket from the neutral gate. Local 1 acknowledged it could have mistakenly believed the neutral gate had been tainted, noted it did not know another electrical contractor was on-site, and stated it did not ask Lindenwood about the electrical deliveries through the neutral gate before it decided to set up a picket. Local 1 did not ask Lindenwood about the possibility that Ruzicka Electric had tainted the neutral gate before it picketed the gate because Lindenwood "was not real happy with [Local 1] at the time" based on "past experience" and Local 1's picketing activities.

At trial, Mueller testified, in a confusing fashion, that ironworkers left their jobs because of Local 1's picket. Without mentioning a specific date, Mueller also testified she saw at least one Local 1 agent wearing an observer vest at the neutral gate talking to ironworkers. Specifically, she stated, "The conversation that I personally witnessed was the [Local 1] individuals stating to the ironworker individuals, Hey, don't cross the line, stick with us, don't go in there. . . . Those particular individuals did not cross through the neutral gate." During cross-examination, Mueller stated the ironworkers told her on multiple occasions "that Local 1 had told them to leave the job." Mueller also said she saw observers at the neutral gate talking to "ironworkers and other tradesmen" several times on multiple days from July to October 2001. Mueller stated she saw observers and picketers at the neutral gate "standing in the right of way, standing on [Lindenwood's] property, standing within the median of [Lindenwood's] property,

sometimes standing on the side, sometimes flagging cars down versus just standing there." Mueller also testified she saw a Local 1 member wear an observer vest one moment, and then, within minutes, switch to being a picketer.

John Campbell (Campbell), a Ruzicka Electric employee, testified that, during the summer and fall of 2001, he saw a Local 1 observer at a neutral gate "actually stop[] a concrete truck and ha[ve] a conversation with the driver, and immediately afterwards the concrete truck left." Campbell also testified that, in late August or early September, he saw Local 1 agents wearing picket vests at the neutral gate in the morning until the ironworkers would leave the job site, at which time "the picketers would change their vests to observer vests." Campbell estimated this activity occurred about three or four times a week for two weeks. Anthony Giuliani (Giuliani), another Ruzicka Electric employee, also testified he saw Local 1 agents wear vests (which he could not read) until the ironworkers, plumbers and carpenters did not cross the picket, at which time the Local 1 agents changed into other vests.

Larry Davis (Davis), who worked for the general contractor as project manager in 2001 and now consults for Lindenwood, testified he saw Local 1 agents without observer vests while at the neutral gate, and he also saw them cross their arms while wearing vests in a manner that would cover up "observer." Davis himself could not read what the vests said. Ruzicka testified he "saw a specific instance once where the [Local 1] observer was talking with employees, ironworkers and plumbers and craftsmen for the job site, before they . . . were going to enter the project, and then that was one of the days that nobody showed up."

On August 23, Local 1 handbillers distributed leaflets at the Lindenwood job site to publicize its labor dispute with Ruzicka Electric and to counter public comments that Local 1 was violating the law in its picketing. The leaflets explained Local 1's labor dispute was with Ruzicka Electric, Local 1 was not asking any employee to stop working, and Local 1 was not seeking to stop any deliveries. The

leaflet also explained Local 1 had charged Ruzicka Electric with violating federal labor law, and Ruzicka Electric settled those charges with the National Labor Relations Board (NLRB). Local 1 attached a copy of Ruzicka Electric's settlement to the leaflets.

At the beginning of the school year at Lindenwood, Local 1 distributed leaflets "to the students and parents of Lindenwood." Local 1 also sent a letter to Lindenwood's president and board of directors advising them "of the steps that Local One is taking in our non-picketing publicity campaign arising from our labor dispute with Lindenwood College." In addition to detailing Local 1's planned publicity campaign, the letter stated "Local One is always ready to resolve this labor dispute with Lindenwood in a good faith manner."

Davis testified the Lindenwood project was scheduled to be completed by August 15, but was not completed until late October. Davis testified the schedule got off track for several reasons, but noted Local 1's picketing partially caused the delay: "When this situation happened with IBEW Local 1, people started walking off the job. Well, when you–when they walk off the job, other trades go off the job, then that sort of throws everybody behind."

According to Ruzicka, the Lindenwood project involved "a highly complex structure because you have multiple grade entrances to the building." Ruzicka testified numerous contractors work on a critical path in these types of projects, and the critical path requires certain contractors to complete their work before other contractors can complete their portions of the project. Because the ironworkers, who numbered between thirty and forty workers, refused to work, the front portion of the critical path was delayed, which compressed Ruzicka Electric's portion of the schedule. Specifically, Ruzicka stated, "Well, the ironworkers are totally critical path for the first third of the project, and everybody is waiting and waiting and waiting for the ironworkers to get done with their work so everybody else can get started."

Ruzicka testified Local 1's picketing delayed the overall schedule, causing compression of the time to finish the project: "The original schedule where we had an orderly progressive schedule to complete the project was not able to be done. It turned into chaos [where everybody was working in the same places]." Ruzicka testified "the total cost overruns that were caused because of the schedule conflicts and the chaos and the interference from Local 1 with their illegal picketing on the project" totaled $194,040.16. To calculate that number, Ruzicka "took the cost overrun on the project [i.e., 4118 extra hours] and multiplied it by our hourly rate [i.e., $47.12], and I said that is the cost overrun attributed to Local 1 IBEW." When asked on cross-examination if the cost overruns could have been caused by erroneous cost estimates before the project began, Ruzicka responded, "Our estimates almost always come in right on the money."

## B.    Fergusson-Florissant School District Project

Also in 2001, the Fergusson-Florissant School District (School District) built a new elementary school. The School District hired Ruzicka Electric to perform the electrical work on the school. On March 1, 2001, Local 1 sent letters to the School District, Ruzicka Electric and the general contractor for the project, informing them of Local 1's area standards dispute with Ruzicka Electric and that Local 1 would "exercise [its] rights to engage in area standards picketing of [Ruzicka Electric]." The letter advised all parties Local 1's dispute was with Ruzicka Electric only; the area standards picketing would be legal and peaceful; Local 1 did not seek "to cause anyone to cease doing business with anyone else"; and Local 1 would make no effort "to interfere with the activities of any employee on the job site or having business at or near the site." The School District established a dual-gate system at the job site.

Ruzicka testified that, on ten or fifteen occasions between March and April 2001, Local 1 agents left observer vests on a chair at the neutral gate without having an observer present. According to Ruzicka, "the ironworkers simply did not come on the job" for at least six weeks after the unattended observer vests were left at the

neutral gate. Local 1 agents testified an observer vest was left unattended only once at the neutral gate. Another Local 1 agent testified he advised all picketers and observers how to conduct themselves.

On April 5, 2001, Local 1 officials met with School District board members, informing them of Local 1's concerns about the quality of Ruzicka Electric's work, and telling them Ruzicka Electric used apprentices who were not properly trained. At the meeting, Local 1 officials asked the School District to use Local 1 contractors, and also asked the School District to dismiss Ruzicka Electric from the project if Ruzicka Electric violated prevailing wage laws.

Ruzicka Electric contends Local 1 engaged in unlawful picketing by leaving the observer vests unattended at the neutral gate to signal secondary employees to observe a picket. Similar to the testimony relating to the Lindenwood project, Ruzicka testified the ironworkers' absence from the project compressed the work schedule and delayed Ruzicka Electric's ability to finish its portion of the project. According to Ruzicka, Local 1's unlawful signal picketing caused Ruzicka Electric's man hours to double from the estimated 5,609 hours to complete the project to 11,350 hours. Thus, Ruzicka Electric seeks compensation for the additional 5,741 man hours to complete the project.

### C.    Defamation Claims

In October 2001, Joseph Cousin (Cousin), a Local 1 business representative, talked to an employee of the City of St. Louis in charge of a housing project who was preparing to bid out electrical work. Cousin alerted the city employee to "some pictures of some [unfinished] work done by Ruzicka [Electric] from [a high school project] that [Cousin] thought was shoddy work." Cousin argued "shoddy work" means "substandard" and clarified shoddy as "[n]ot in a workman-like manner, sloppy, ugly, not level."

In a separate incident, Lawrence Hepburn (Hepburn), a Local 1 business agent, told the School District's board he "felt" Ruzicka Electric's work on a school project was "dangerous," "improper," and "not up to code." Hepburn never told the School Board that inspectors had found Ruzicka Electric guilty of violating the electrical code. At trial, Hepburn testified he had forty years in the electrical business and he knew the code, and that, "it was my opinion . . . [s]ome of [Ruzicka Electric's work] was dangerous and some of it was against the code."

### D.    Privacy Claim

In April 1998, Local 1 hired a private investigator to investigate Ruzicka Electric and Ruzicka. The private investigator, in turn, hired four additional investigators to conduct surveillance. The investigators surveilled Ruzicka's private residence with the purpose "to establish a daily routine . . . [and] to see what time [Ruzicka] got home." The written surveillance reports detailed when Ruzicka left and returned to his residence, as well as times in the morning and at night when lights were turned on or off. At trial, the private investigator was unable to answer numerous questions, including exactly where he and his investigators were located when they surveilled Ruzicka's residence. However, the investigator said neither he nor his investigators went on Ruzicka's property. The investigators made videotapes of the surveillance and mailed the tapes to Local 1. Ruzicka testified he subpoenaed the surveillance videotapes from Local 1, but Local 1 never produced the videotapes, saying the tapes were lost.

When asked specific questions about the surveillance notes, Ruzicka testified the investigators could not have conducted their surveillance from public streets or the like. For example, when asked whether an investigator could see certain lights in Ruzicka's home from the street, Ruzicka responded, "It would be impossible. I had a very–I enjoy my privacy a lot, and it was a private address, and from public property there is absolutely no way to see my house [because of the] tree lines. There is two reasons. One is that the house was elevated about 30, 40 feet above the street line or

the level of the street, and it is about 300 to 400 feet back, and you have to go through some–the driveway kind of winds around, and it is just impossible to see." Ruzicka also explained his property is lined with about 100 feet of trees, including evergreen trees, stating, "You simply cannot see through there. It is not possible." Based on his knowledge of his property, Ruzicka testified a person would have to be on his property to see the things the surveillance notes depict.

Ruzicka maintains he was appalled, amazed, shocked, and angered when he discovered "somebody had been lurking around on my property . . . taking videotapes of me and my family [and] had been on my property until 11:00 at night on a Saturday." Ruzicka testified the surveillance activities forced him to be concerned about his and his family's safety, noting he felt violated because he "bought a house that [he] thought was private, posted no trespassing signs, and apparently that doesn't do any good." Because of the investigators' surveillance activities, Ruzicka purchased a home security system–including video surveillance cameras–which cost $4,800. He also bought remote starters and security systems for his automobiles. Feeling violated by the surveillance activities, Ruzicka said he and his family suffered heightened anxiety.

### E.    Lawsuit

Ruzicka Electric sued Local 1 under section 303 of the LMRA, 29 U.S.C. § 187(a), alleging Local 1 violated section 158(b)(4)(ii)(B) of the National Labor Relations Act by conducting illegal picketing and secondary boycotts of Ruzicka Electric at the Lindenwood project, the School District project, and the Webster University (Webster) project (Count I).[1] Ruzicka Electric also asserted two counts

---

[1]Before trial, Ruzicka Electric voluntarily dismissed its section 303 claim as it relates to the Webster project.

of defamation against Local 1 (Counts II-III). Ruzicka alleged Local 1 invaded his privacy (Count V).[2]

From August 2 to 9, 2004, Ruzicka Electric and Ruzicka tried their claims to a jury. At trial, Ruzicka Electric attempted to present evidence to the jury regarding Local 1's picketing in 1998 on a project at the Hilton Garden Inn (Hilton). Ruzicka Electric claims Local 1 engaged in unlawful secondary activity at the Hilton job site, causing Ruzicka Electric $193,405.92 in damages. Local 1 moved to exclude this evidence, because it was unrelated in time and place to the alleged unlawful picketing identified in Ruzicka Electric's complaint. The district court excluded the evidence regarding Local 1's conduct at the Hilton job site, noting Ruzicka Electric specifically pled three sites, which did not include the Hilton job site.

During trial, the district court allowed Local 1's evidence of its prevailing wage complaint against Ruzicka Electric with the Missouri Department of Labor and Industrial Relations involving Ruzicka Electric's work on the School District project. The evidence showed Ruzicka Electric owed $12,331.35 in restitution to eight of its employees and $1,240 in penalties to the School District. Local 1 sought to admit this evidence to show Local 1 pursued its prevailing wage claim against Ruzicka Electric after Local 1 officials met with School District officials. The district court also allowed Local 1 to enter into evidence a settlement agreement between Ruzicka Electric, Local 1 and the NLRB. This settlement agreement was attached to the handbill Local 1 distributed at the Lindenwood project publicizing its area standards dispute with Ruzicka Electric.

---

[2]Not relevant to this appeal, Count IV alleged tortious interference with a contract and business expectancy.

At the close of Ruzicka Electric's and Ruzicka's case, the district court entered judgment as a matter of law in favor of Local 1 on all claims. Ruzicka Electric and Ruzicka appeal.

## II. DISCUSSION

We review de novo the district court's grant of judgment as a matter of law to Local 1. <u>Dossett</u>, 399 F.3d at 953. The district court appropriately granted judgment as a matter of law to Local 1 if Ruzicka Electric and Ruzicka were "fully heard" and "no legally sufficient evidentiary basis" exists for a reasonable jury to find for them on their claims. Fed. R. Civ. P. 50(a)(1).

### A. Secondary Activity

Section 303 of the LMRA provides a private cause of action for a person injured by a "labor organization [engaged] in any activity or conduct defined as an unfair labor practice in section 158(b)(4)." 29 U.S.C. § 187. Section 158(b)(4) forbids secondary activity (including secondary picketing):

> It shall be an unfair labor practice for a labor organization or its agents–
> . . . to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is . . . forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, . . . : *Provided*, That . . . this clause [] shall [not] be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 U.S.C. § 158(b)(4)(ii)(B) (emphasis in original). Congress enacted section 158(b)(4)(ii)(B) because it was concerned with third parties getting involved with labor disputes not their own. <u>NLRB v. Local 825, Int'l Union of Operating Eng'rs</u>, 400 U.S. 297, 302 (1971). Congress focused its concern "on the secondary boycott,

which was conceived of as pressure brought to bear, not upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands." Id. at 302-03 (quotations, citations and footnotes omitted). Section 158(b)(4)(ii)(B) "also reflects a concern with protecting labor organizations' right to exert legitimate pressure aimed at the employer with whom there is a primary dispute." Id. at 303. Thus, a labor organization's "primary activity is protected even though it may seriously affect neutral third parties." Id. Only when a labor organization intends "to enmesh neutral secondary employers in primary labor disputes between the union and another employer" does it violate federal labor law. NLRB v. Constr. & Gen. Laborers' Union Local 1140, 577 F.2d 16, 18 (8th Cir. 1978).

Our task is not to scour the record for evidence of how Local 1's conduct impacted neutral employers at the job sites at the heart of this dispute, i.e., we have no interest in the consequences to neutral employers or to Ruzicka Electric, for that matter, of Local 1's legitimate, primary labor activity. Instead, we review the record to determine whether evidence exists showing Local 1 engaged in prohibited secondary activity aimed at neutral employers. Operating Eng'rs, 400 U.S. at 303. If Local 1 engaged in secondary activity, then it violated federal labor law. Although seemingly straightforward in its presentation, we understand our task is not mundane. According to the Supreme Court, "the tapestry that has been woven in classifying such conduct [as either primary or secondary] is among the labor law's most intricate." Id.

Ruzicka Electric argues it presented sufficient evidence to prove Local 1 engaged in unlawful secondary activity, that its unlawful activity caused neutral employers at the job sites to stop working, and that the failure of those neutral employers to work compressed the work schedule such that Ruzicka Electric incurred greater costs to complete its work. Local 1 maintains Ruzicka Electric failed to prove

Local 1 deliberately coerced neutral employers not to do business with Ruzicka Electric, and Ruzicka Electric failed to prove Local 1's picketing activity caused Ruzicka Electric's alleged damages. We agree with Local 1, the two main issues concerning the section 303 claims are (1) whether Ruzicka Electric established Local 1's picketing activity was focused on neutral employers; and (2) whether that activity, if any, damaged Ruzicka Electric.

### 1.    Lindenwood Project

Ruzicka Electric contends it presented sufficient evidence for a reasonable jury to find Local 1 engaged in unlawful secondary activity on the Lindenwood project. We agree, because the evidence at trial could support a jury finding Local 1 encouraged employees of neutral employers not to work at the job sites. Lane Crane Serv., Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 177, 704 F.2d 550, 553 (11th Cir. 1983) (stating picketing "will be considered unlawful if *any* object of the picketing is for an unlawful purpose. The picketing will be unlawful if there is an expectation or a hope or a desire that employees of the secondary employer will be induced or encouraged to take *concerted* action to quit working behind the picket line in order that a prohibitive secondary effect on the primary employer will occur.") (quotations and citations omitted). For example, Mueller testified Local 1 agents asked ironworkers, i.e., employees of neutral employers, not to cross the picket line. In addition, Ruzicka Electric presented evidence that Local 1 agents, acting as observers at the neutral gate, engaged in picketing activity, asking neutral employees to refuse to work. If believed, this evidence establishes Local 1 engaged in unlawful secondary activity.

Ruzicka Electric's evidence also allows a reasonable inference Local 1 picketed the neutral gate, with the resulting inference Local 1 engaged in unlawful secondary activity. Local 1's decision to picket the neutral gate created a rebuttable presumption it intended to ensnare neutral employers in its labor dispute with Ruzicka Electric. See Kinney v. Int'l Union of Operating Eng'rs, Local 150, 994 F.2d 1271,

1275 (7th Cir. 1993); see also NLRB v. Int'l Union of Elevator Constructors, 902 F.2d 1297, 1308 (8th Cir. 1990). Although Local 1 may attempt to rebut this presumption at trial, it has not rebutted the presumption as a matter of law. For instance, the evidence at trial showed Local 1 decided to picket the neutral gate based on an arguably inadequate investigation of whether a neutral employer received electrical deliveries through the neutral gate. Indeed, the evidence showed a neutral electrical contractor was on-site, and no electrical deliveries were made to Ruzicka Electric through the neutral gate. In addition, Lindenwood faxed a letter to Local 1 on July 18 explaining the neutral gate had not been tainted and demanding Local 1 cease its unlawful picketing of the neutral gate. Although Local 1 claims it was not aware of the letter, a jury is better equipped to resolve factual and credibility disputes like this.

Finally, Ruzicka Electric presented evidence Local 1 agents actively interchanged observer and picket vests while at the neutral gate. For instance, Local 1 agents wore picket vests at the neutral gate until employees of neutral employers left the job site, at which time the agents changed into observer vests. A reasonable jury could decide the purpose for this activity was to force neutral employers off the job site in support of Local 1's primary dispute with Ruzicka Electric. If this conduct occurred, it is unlawful.

Without any doubt, Local 1's primary labor dispute with Ruzicka Electric gave Local 1 the right to picket Ruzicka Electric and to place observers at the neutral gate to ensure Ruzicka Electric was not avoiding the effects of Local 1's lawful picket. See, e.g., Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB, 366 U.S. 667 (1961); NLRB v. Local 825, A, B, C, D, Int'l Union of Operating Eng'rs, 659 F.2d 379, 387 (3d Cir. 1981). By design, Local 1 established procedures to ensure its picketers and observers complied with federal labor law. For instance, Local 1 wrote to Lindenwood and Ruzicka Electric about its intent to engage in lawful area standards picketing against Ruzicka Electric at the Lindenwood job site. Indeed, this

-15-

notice allowed Lindenwood to establish a dual-gate system to protect innocent, neutral employers from Local 1's dispute with Ruzicka Electric. Local 1 properly promised not to enmesh neutral employers in the labor dispute, and provided written instructions to its picketers and observers on how to act. Although Local 1 may have intended to comply fully with federal labor law by engaging only in primary activity, we conclude this case presents conflicting evidence about whether Local 1 engaged in unlawful secondary activity at Lindenwood. Thus, Ruzicka Electric is entitled to have a jury–and not judges–determine whether Local 1 violated federal labor law by engaging in unlawful secondary activity at the Lindenwood project.

Local 1 maintains that, even if Ruzicka Electric provided sufficient evidence to prove Local 1 engaged in unlawful secondary activity, Ruzicka Electric failed to prove the unlawful activity proximately caused damages. Local 1 is correct, Ruzicka Electric must prove Local 1's unlawful secondary activity proximately caused damages, as any "damages" caused by Local 1's lawful, primary activity are not compensable. See Pickens-Bond Constr. Co. v. United Bhd. of Carpenters & Joinders of Am., Local 690, 586 F.2d 1234, 1239, 1242 (8th Cir. 1978). Although proof of damages cannot be speculative or conjectural, mathematical precision is not required–proof to a reasonable certainty is sufficient. LeSueur Creamery, Inc. v. Haskon, Inc., 660 F.2d 342, 349-50 (8th Cir. 1981). We conclude Ruzicka Electric presented sufficient evidence on damages such that a jury could decide the issue without resorting to rank speculation or conjecture. We also reiterate the longstanding and "familiar principle that one whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered is not entitled to complain of the difficulty of exact computation." Karlen v. Ray E. Friedman & Co. Commodities, 688 F.2d 1193, 1202 (8th Cir. 1982); see also Eastman Kodak Co. of N.Y. v. S. Photo Materials Co., 273 U.S. 359, 379 (1927) (explaining "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

Thus, we will not accept Local 1's argument that its unlawful secondary activity, if any, did not cause Ruzicka Electric's alleged damages. Instead, a jury should determine the extent of Ruzicka Electric's damages if the jury determines Local 1 violated federal labor law.

### 2. School District Project

We also conclude Ruzicka Electric presented sufficient evidence to prove Local 1 engaged in unlawful secondary activity at the School District project. Because the same principles discussed above also control our resolution of this issue, we will not belabor our discussion. The evidence permitting this issue to go to a jury focuses on leaving unattended observer vests at the neutral gate. When conducted properly and not associated with a picket, the placement of observers is perfectly legal, such that we can determine no secondary activity exists as a matter of law. See Local 825, 659 F.2d at 387. Local 1 claims it left an observer vest unattended only once, but the evidence conflicts on this issue, as Ruzicka Electric presented evidence that Local 1 left observer vests unattended at the neutral gate on ten or fifteen different occasions. When a union engaged in picketing activity at a job site leaves observer vests sitting at a neutral gate ten to fifteen different times, we cannot determine the union's intent as a matter of law. Instead, we leave to a jury the question of Local 1's intent in leaving the unattended vests at the neutral gate.

Local 1 also claims Ruzicka Electric failed to prove damages on this claim. As discussed above, we believe the question of damages is better left to a jury.[3]

---

[3]Local 1 suggests it is immune from liability under section 303 of the LMRA because it complied with the so-called Moore Dry Dock standards. See Sailors' Union of the Pac. (Moore Dry Dock), 92 N.L.R.B. 547 (1950). Although one way to unmask a union's compliance with its requirement to limit its picketing to the primary employer is to use Moore Dry Dock as an analytical tool, a union's compliance with the Moore Dry Dock standards does not require a finding that the union did not engage in unlawful secondary activity. See, e.g., Pickens-Bond Constr. Co., 586 F.2d

**B. Defamation**

Ruzicka Electric maintains the district court erred by dismissing its defamation claims, arguing Cousin's and Hepburn's statements were defamatory under Missouri law. Local 1 contends Cousin's and Hepburn's statements were merely opinions which could not be defamatory.

To make a submissible claim of defamation in Missouri, Ruzicka Electric must establish the following elements: "(1) publication, (2) of a defamatory statement, (3) which identifies the plaintiff, (4) that is false, (5) that is published with a requisite degree of fault and (6) damages the plaintiff's reputation." Sterling v. Rust Commc'ns, 113 S.W.3d 279, 281 (Mo. Ct. App. 2003). Outside of the labor context, we recently had the opportunity to discuss Missouri defamation law. See Hammer v. City of Osage Beach, 318 F.3d 832, 842-44 (8th Cir. 2003). In Hammer, we listed "a two-part test for reviewing allegedly defamatory statements to determine whether a plaintiff can survive summary judgment: (1) whether the statement is capable of having a defamatory meaning and, if so, (2) whether one or more privileges shields the defendant from legal action." Id. at 842. In addressing the first part of the test, we noted "[s]tatements of opinion, even if made maliciously or insincerely, are afforded absolute privilege under the free speech clause of the First Amendment." Id. Courts determine as a matter of law whether an alleged defamatory statement constitutes "a protected opinion or an actionable assertion of fact." Id. In making this determination, we ask "'whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact'" or merely gives an opinion. Id. at 842-43 (quoting Ribaudo v. Bauer, 982 S.W.2d 701, 705 (Mo. Ct. App. 1998)).

---

at 1241. Because we find evidence indicating Local 1 may have engaged in unlawful secondary activity at the Lindenwood and School District projects, we have no need to apply the Moore Dry Dock standards.

However, within the context of a labor dispute, state defamation law is partially preempted by federal labor law. Beverly Hills Foodland, Inc. v. United Food & Commercial Workers Union, Local 655, 39 F.3d 191, 194 (8th Cir. 1994). When federal labor law principles are implicated, as they are in this case, a plaintiff asserting a defamation claim must satisfy "an actual malice standard similar to that announced in New York Times Co. v. Sullivan, 376 U.S. 254 (1964)." Id. Thus, even in the labor context, "malicious defamation enjoys no constitutional protection." Id. at 195. Consequently, "[s]tate libel and slander actions may be maintained within the context of a labor dispute but only if the defamatory publication is shown by clear and convincing evidence to have been made 'with knowledge that it was false or with reckless disregard of whether it was false or not.'" Id. (quoting Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 281 (1974)).

We conclude the district court correctly granted judgment as a matter of law to Local 1 on Ruzicka Electric's defamation claims, because Cousin's and Hepburn's statements uttered in the midst of the labor dispute were not defamatory. The alleged defamatory statements were opinions, not assertions of objective facts. Cousin simply alerted a city employee to pictures of work Cousin "*thought* was shoddy." Speaking to a school board, Hepburn said he "*felt*" Ruzicka Electric's work was "dangerous," "improper," and "not up to code." These men gave their opinions regarding the quality of Ruzicka Electric's work, i.e., no reasonable person hearing these statements could conclude the statements were intended to give objective facts. See, e.g., Pape v. Reither, 918 S.W.2d 376, 380-81 (Mo. Ct. App. 1996) (holding (1) statements beginning with "it is my position," "it is my belief," or "I will attempt to prove" are merely opinions not subject to defamation claims, because they are not verifiable propositions; and (2) "allegations of fraudulent or illegal conduct are conclusions about the consequences that should attach to certain conduct, and as such they too are opinions"). Given the longstanding labor dispute between Local 1 and

-19-

Ruzicka Electric, we conclude Ruzicka Electric needed considerably more evidence than it produced in this case to hold Local 1 liable for defamation.[4]

### C.     Invasion of Privacy

Ruzicka seeks reversal of the district court's grant of judgment as a matter of law to Local 1 on the invasion of privacy claim. Ruzicka maintains Local 1's investigators unreasonably intruded upon Ruzicka's seclusion when they trespassed at his private residence early in the morning and late at night in order to conduct surveillance on Ruzicka. Local 1 argues Ruzicka failed to produce direct evidence the investigators trespassed on Ruzicka's property, and notes the private investigator testified neither he nor his investigators went onto Ruzicka's property when conducting surveillance. Thus, Local 1 contends the district court correctly granted judgment as a matter of law on this claim.

In Missouri, a person's "right of privacy is legally protected, and violation of such right can under given circumstances provide an entitlement to relief." Sofka v. Thal, 662 S.W.2d 502, 509 (Mo. 1983). The general tort of invasion of privacy actually describes four distinct torts under Missouri law: "(1) unreasonable intrusion upon the seclusion of another; or (2) appropriation of the other's name or likeness; or (3) unreasonable publicity given to the other's private life; or (4) publicity that unreasonably places the other in a false light before the public." Id. at 510 (citing Restatement (Second) of Torts § 652A (1977)). Ruzicka's invasion of privacy claim invokes the first tort–unreasonable intrusion upon the seclusion of another.

---

[4]We also question whether Ruzicka Electric proved Cousin's or Hepburn's statements actually were false, which is required to prove defamation. Furthermore, we see little evidence indicating Ruzicka Electric met the heightened actual malice standard. Regardless, we need not rule on these issues after concluding Cousin and Hepburn simply asserted their opinions regarding a non-union contractor at the heart of a labor dispute.

The Missouri Supreme Court defines unreasonable intrusion upon the seclusion of another as follows:

> One who intentionally intrudes, physically or otherwise upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Id. (quoting Restatement (Second) of Torts § 652B). Thus, "[t]o make a submissible case of intrusion upon seclusion, plaintiff must prove three elements: (1) the existence of a secret and private subject matter; (2) a right possessed by plaintiff to keep that subject matter private; and (3) the obtaining of information about that subject matter by defendant through some method objectionable to the reasonable" person. Corcoran v. Sw. Bell Tel. Co., 572 S.W.2d 212, 215 (Mo. Ct. App. 1978). Whether a defendant obtained information through a method objectionable to the reasonable person is "ordinarily a question for the jury." Sofka, 662 S.W.2d at 511.

We conclude Ruzicka easily established the first two elements of his invasion of privacy claim. Ruzicka testified he built his home for privacy and seclusion, and his property was set off from the public and was lined with 100 feet of trees. Ruzicka even posted no trespassing signs. Indeed, Missouri protects Ruzicka's personal residence from criminal trespass. See Mo. Rev. Stat. § 569.140. There can be no doubt Ruzicka's home is "a secret and private subject matter" that Ruzicka has a right to keep private. See Engman v. Sw. Bell Tel. Co., 591 S.W.2d 78, 81 (Mo. Ct. App. 1979) (holding "[t]he existence of the [plaintiffs'] apartment and the right of the [plaintiffs] to keep that place of abode private satisfies the first two elements" of an invasion of privacy claim).

Thus, the critical issue is whether Ruzicka produced sufficient evidence for a reasonable jury to find Local 1's investigators obtained information about Ruzicka's

home "through some method objectionable to the reasonable" person. We conclude he has. Ruzicka testified his property's layout precluded anyone from viewing the home from public places. He specifically explained it is impossible to see from public property whether the lights in his home were on or off, noting a person would have to be on his property to make those determinations. If Ruzicka's testimony and evidence is believed, a reasonable jury could conclude Local 1's investigators trespassed on Ruzicka's private property to conduct surveillance of him and his family. We believe a reasonable person may object to strangers entering his posted private property to record when he sleeps and awakes inside his home, and may consider such as highly offensive. Following the Missouri Supreme Court's admonition, we believe the third element presents a jury question. Because Ruzicka presented sufficient evidence on his invasion of privacy claim to present the claim to a jury, we reverse the district court's grant of judgment as a matter of law to Local 1, and remand the claim for a new trial.

### D. Hilton Project

Ruzicka Electric claims the district court abused its discretion by not allowing Ruzicka Electric to present its claim that Local 1's conduct at the Hilton project violated section 303 of the LMRA. We disagree. After scouring Ruzicka Electric's section 303 allegations in its complaint, we see no hint Ruzicka Electric claimed Local 1 violated section 303 by its conduct at the Hilton site. Ruzicka Electric does not discuss, mention or complain about Local 1's conduct at the Hilton site. In contrast, Ruzicka Electric specifically referenced the Webster project, the School District project, and the Lindenwood project, leaving no doubt what projects were at the heart of this case. Before trial, Ruzicka Electric never sought to amend its specific and detailed complaint alleging three labor law violations, even though it voluntarily dismissed its section 303 claim involving the Webster project. We conclude the district court did not abuse its discretion by rejecting Ruzicka Electric's bid to present a labor law claim regarding the Hilton project. See Kinkead v. Sw. Bell Tel. Co., 49 F.3d 454, 457 (8th Cir. 1995) (holding the district court did not abuse its

discretion in denying a motion to amend the complaint to add new claims when the motion came two years after the filing of the complaint).

### E. Evidentiary Rulings

Finally, Ruzicka Electric makes a brief and cursory argument that the district court erroneously admitted Local 1's evidence pertaining to Ruzicka Electric's administrative matters before the NLRB and the Missouri Department of Labor and Industrial Relations. Because Local 1 offered this evidence in response to contentions made by Ruzicka Electric, we conclude the district court did not abuse its discretion by allowing Local 1 to present this evidence to the jury.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's grant of judgment as a matter of law to Local 1 on Ruzicka Electric's section 303 claims involving the Lindenwood and School District projects, and on Ruzicka's invasion of privacy claim. We remand those claims to the district court for a new trial. We affirm the district court in all other respects.

_____