# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 16-2786

———————————————

Thomas B. Wartman; Victoria's Market, LLC; Glen Lake's Market, LLC; ART, LLC; Thomas W. Wartman

*Plaintiffs - Appellants*

v.

United Food and Commercial Workers Local 653

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the District of Minnesota - Minneapolis

——————————

Submitted: March 9, 2017
Filed: September 15, 2017

——————————

Before WOLLMAN, COLLOTON, and SHEPHERD, Circuit Judges.

——————————

WOLLMAN, Circuit Judge.

Thomas B. Wartman, Victoria's Market, LLC; Glen Lake's Market, LLC; ART, LLC; and Thomas W. Wartman (Plaintiffs) filed suit under 29 U.S.C. § 187. Plaintiffs alleged that United Food and Commercial Workers Local 653 (the Union) had engaged in unfair labor practices, in violation of § 8(b)(4) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(b)(4). Plaintiffs appeal from the district

court's[1] order granting the Union's motion to dismiss for failure to state a claim upon which relief could be granted.[2] We affirm.

## I. Background

The facts set forth below are consistent with the allegations set forth in Plaintiffs' complaint. Gillis v. Principia Corp., 832 F.3d 865, 868 n.3 (8th Cir. 2016) (taking as true facts from complaint for purposes of a motion to dismiss). Non-parties Fresh Seasons Market, LLC, and Fresh Seasons Victoria, LLC, operated two grocery stores (collectively, Fresh Seasons) in Minnesota. They entered into a collective bargaining agreement with the Union. Thomas B. Wartman had a 96% ownership interest in Fresh Seasons. His son Thomas W. Wartman had no ownership interest in the stores. Fresh Seasons closed in 2014, following which the Union claimed that Fresh Seasons owed its union employees unpaid wages, vacation pay, and holiday pay.

After Fresh Seasons closed, two new grocery stores opened in their locations—Glen Lake's Market and Victoria's Market (collectively, the Markets). Thomas B. Wartman had no ownership interest in the Markets; they were owned equally by Mark Ploen and ART, LLC. Thomas B. Wartman's three sons—Adam, Ryan, and Thomas W.—held equal shares of ART, LLC. There was little overlap among the employees of Fresh Seasons and the Markets, and the Markets did not enter into a collective bargaining agreement with the Union.

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

[2]The district court declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims and dismissed them without prejudice, a decision that Plaintiffs do not challenge on appeal.

Beginning in May 2015, the Union picketed the Markets daily for approximately six months. According to Plaintiffs, picketers accosted the stores' patrons and took photographs of their vehicles and license plates. Union members also displayed banners, distributed handbills, published articles, and established a website, posting its claims of unpaid compensation and urging the public not to shop at the Markets. These communications stated that "Tom Wartman" owed unpaid compensation to Fresh Seasons' employees, and they did not distinguish between Thomas B. Wartman and Thomas W. Wartman.

The complaint alleged that the Union's picketing and publicity campaign against the Markets constituted an effort "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," with the object of "forcing or requiring any person . . . to cease doing business with any other person," in violation of 29 U.S.C. § 158(b)(4)(ii)(B). The district court granted the Union's motion to dismiss, reasoning that because Fresh Seasons was no longer in business, the Union's object could not have been to force or require the Markets to cease doing business with it. The court concluded that the object of the picketing and publicity campaign did not fall within the statute because the Union instead "sought to pressure plaintiffs, who are acquainted with or related to the owners of Fresh Seasons, to encourage Fresh Seasons to resolve its dispute with the Union." D. Ct. Order of May 19, 2016.

## II. Discussion

"We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Gillis, 832 F.3d at 871 (internal quotation marks and citation omitted).

It is an unfair labor practice for a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," where an object thereof is "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). "[That] statute is part of § 8(b)(4), in which Congress curbed the use of coercive and disruptive union actions undertaken to pressure a neutral or secondary employer . . . with the intent of forcing the neutral to cease doing business with a primary employer . . . with which the union has an on-going collective bargaining dispute." Laborers Dist. Council v. NLRB, 688 F.3d 374, 376-77 (8th Cir. 2012). "Restrictions on secondary boycotts . . . implement dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not their own." Id. at 377 (quoting Sheet Metal Workers' Int'l Ass'n v. NLRB, 989 F.2d 515, 519 (D.C. Cir. 1993)). The statute provides that § 158(b)(4)(ii)(B) not be construed "to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

The Union does not dispute that its conduct did "threaten, coerce, or restrain" the Markets. It argues, however, that it did not have as its object that of forcing or requiring any person to cease doing business with any other person. According to the Union, it could not have had such an object in light of the fact that the Fresh Seasons stores were closed, making impossible any attempt to force the Markets to cease doing business with them.

Plaintiffs contend that the phrase "forcing or requiring any person . . . to cease doing business with any other person" prohibits a union from picketing a secondary employer with the aim of forcing it to exert pressure on the primary employer, even where such pressure takes a form other than the disruption of a business relationship. They point to cases which they say support this theory. See NLRB v. Local 825, Int'l

Union of Operating Eng'rs, 400 U.S. 297, 302-03 (1971) (describing a secondary boycott as "pressure brought to bear, not upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it with the objective of forcing the third party to bring pressure on the employer to agree to the union's demands" (internal quotation marks and citations omitted)); Ruzicka Elec. & Sons, Inc. v. Int'l Bhd. of Elec. Workers, Local 1, 427 F.3d 511, 519 (8th Cir. 2005) ("Only when a labor organization intends 'to enmesh neutral secondary employers in primary labor disputes between the union and another employer' does it violate federal labor law." (quoting NLRB v. Constr. & Gen. Laborers' Union Local 1140, 577 F.2d 16, 18 (8th Cir. 1978))); see also Ruzicka, 427 F.3d at 519 ("If Local 1 engaged in secondary activity, then it violated federal labor law.").

In these cases, however, it was clear that an object of the union was to force a person to cease doing business with another person. In Ruzicka, the union had a primary dispute with an electrical contractor, which had been hired to perform electrical work at a university. Ruzicka, 427 F.3d at 513-14. The university established a dual-gate system, reserving a gate for the electrical contractor and its suppliers and another gate for neutral contractors who were not involved in the labor dispute. Id. at 514. The electrical contractor alleged that the union had picketed the neutral gate. Id. at 520-21. Thus, in Ruzicka the court considered a set of facts from which a jury could find that the union's object was to interfere in the business relationships among multiple employers—the electrical contractor, the neutral contractors, the general contractor, and the university.

In Operating Engineers, a general contractor for the construction of a nuclear power generation plant subcontracted work to three companies—White, Chicago, and Poirier. 400 U.S. at 299-300. Employees of all three subcontractors were members of the union, but unlike the other two, White did not have a collective bargaining agreement with the union. After White installed an electric welding machine, the union demanded that the machine be operated by union members. Id. at 300. White

refused, and the union threatened the general contractor with a strike if it did not sign a contract that would require the subcontractors to assign the operation of the welding machine to union members. Id. After the general contractor refused to do so, the union ordered a strike. Id. at 300-01. The court of appeals concluded that the union lacked the requisite object because its aim was merely for the general contractor to influence White to change its conduct, but the Supreme Court rejected that conclusion as too narrow. Id. at 304. The Court reasoned that, although the union's preference was for the subcontractors to comply with its demands, "[t]he clear implication of the demands was that [the general contractor] would be required either to force a change in White's policy or to terminate White's contract." Id. at 305.

In both Ruzicka and Operating Engineers, the unions' conduct satisfied the second prong of § 158(b)(4)(ii)(B) because it was designed to force one employer to cease doing business with another employer. Accordingly, these cases do not support the proposition that "enmeshing" a secondary party in the union's conflict with the owner of a now-defunct business is conduct sufficient to constitute a violation of the statute.

Alternatively, Plaintiffs argue that the Union violated § 158(b)(4)(ii)(B) because its object was to force the Markets' customers and suppliers to cease doing business with the stores. Plaintiffs argue that, under International Longshoremen's Ass'n v. Allied International, Inc., 456 U.S. 212 (1982), the "cease doing business" object set forth in § 158(b)(4)(ii)(B) does not require a business relationship between the primary and secondary employers, and that the disruption of business relationships between neutral parties meets the statute's object element. In that case, a longshoremen's union refused to handle cargo to or from the Soviet Union for political reasons. Id. at 214-15. The union's refusal to do so disrupted business between Allied, an importer of Russian products; Waterman, a shipper of those products; and Clark, a stevedoring company that unloaded Waterman's ships and whose employees were members of the longshoremen's union. Id. at 215-16. Even

though the union had no dispute with its primary employer, the Court held that the union had violated § 158(b)(4)(ii)(B) because its conduct forced Allied, Clark, and Waterman to cease doing business with one another and that disruption of business relationships was a consequence that the union foresaw.  Id. at 218-27.[3]

The alleged disruption in this case is different from that which occurred in Allied International.  Plaintiffs alleged that the picket disrupted the Markets from doing business with their customers and suppliers, which, as explained more fully below, is the type of disruption resulting from any picket.

Plaintiffs also cite Miami Newspaper Printing Pressmen, Local 46 (Knight Newspapers, Inc.), 138 N.L.R.B. 1346 (1962), in support of their argument that disruption of business between neutral parties satisfies the statute's object requirement.  The Miami Herald and the Detroit Free Press were owned by the same company, Knight Newspapers.  Id. at 1347.  In connection with its dispute with the Miami Herald, the union picketed the premises of the Detroit Free Press.  Id. at 1349. The National Labor Relations Board (Board) determined that the two newspapers were separate entities doing "only nominal business with each other."  Id. at 1347. The Board concluded that because the union "picketed Knight, publisher of the Detroit Free Press, with the object of forcing it to cease doing business with its customers and suppliers, it engaged in unlawful secondary activity."  Id. at 1348.  The Court of Appeals enforced the Board's order.  Miami Newspaper Pressmen's Local No. 46 v. NLRB, 322 F.2d 405 (D.C. Cir. 1963).  It agreed with the Board that the statute is not limited to interference in the business relationship between a secondary and a primary employer, reasoning that if a secondary employer "could with impunity

---

[3]Moreover, the refusal to handle shipments to or from a particular country would likely violate the separate, prohibited object set forth in § 158(b)(4)(ii)(B)—"forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer"—while the picketing here did not.

be forced to suspend its business relations with all persons other than the primary employer, the evil which Congress sought to get at would be complete." Id. at 410; see also Nat'l Maritime Union v. NLRB, 342 F.2d 538, 543 (2d Cir. 1965) ("Whether the striking union is at war with a primary employer and puts damaging economic pressure on a neutral employer with the design of increasing the economic pressure on the primary employer . . . or is, instead, at war with another union and . . . is using damaging economic pressure on a neutral employer to achieve its objective . . . makes no logical difference in the light of the clear purpose and intention of Congress to confine the warfare to an area which includes direct action against the principal antagonist . . . .").

Similarly, in United Marine Division, Local 333, International Longshoremen's Ass'n (New York Shipping Ass'n), 107 N.L.R.B. 686 (1954), the Board determined that a union had acted with the requisite "cease doing business" object, despite the fact that the union did not aim to disrupt business between primary and secondary employers. The union had a dispute with companies that operated tugboats at the Port of New York, leading it to declare a strike against the companies. Id. at 698. Subsequently, the union picketed several of the Port's piers, despite the fact that the tugboat companies had ceased their operations due to the strike, disrupting business between shipping companies and others using the piers. Id. at 707. The Board concluded that the picketing was prohibited by the statute. Id. at 709-11.

Notwithstanding these decisions, we conclude that the cessation of business between the Markets and their customers and suppliers was not an object prohibited by § 158(b)(4)(ii)(B). As the United States Supreme Court has stated:

> Whatever may have been said in Congress preceding the passage of the Taft-Hartley Act concerning the evil of all forms of "secondary boycotts" and the desirability of outlawing them, it is clear that no such sweeping prohibition was in fact enacted in § 8(b)(4)(A). The section

does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives.

Local 1976, United Bhd. of Carpenters & Joiners v. NLRB ("Sand Door"), 357 U.S. 93, 98 (1958), superseded on other grounds by statute, Landrum-Griffin Act, Pub. L. 86-257, 73 Stat. 519, 542-45 (1959), *as recognized in* Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 652-55 (1982). The Markets' business with their customers and suppliers may have been disrupted, but such a disruption would be the result of any successful picketing of a secondary employer. As the Court stated in the context of action against a primary employer:

> A strike, by its very nature, inconveniences those who customarily do business with the struck employer. Moreover, any accompanying picketing of the employer's premises is necessarily designed to induce and encourage third persons to cease doing business with the picketed employer. It does not follow, however, that such picketing is therefore proscribed by Section 8(b)(4)(A) of the Act.

Local 761, Int'l Union of Elec., Radio, & Mach. Workers v. NLRB, 366 U.S. 667, 675 (1961) (quoting Oil Workers Int'l Union, Local 346 (Pure Oil Co.), 84 N.L.R.B. 315, 318 (1949)). Likewise, although any picket of a secondary employer is likely to interfere with its business relationships with its customers and suppliers, it does not follow that every picket of a secondary employer is prohibited by § 158(b)(4)(ii)(B). Had Congress intended to achieve such a result, we doubt that it would have created a statute prohibiting only conduct with an object of "forcing or requiring any person . . . to cease doing business with any other person."

Absent a "cease doing business" object beyond the disruption of relationships with customers and suppliers, which any picketed business would suffer, we hold that the Union's conduct in this case did not violate the statute.[4]

The judgment is affirmed.

COLLOTON, Circuit Judge, dissenting.

The issue in this appeal is whether the Plaintiffs' complaint adequately alleged that the Union violated § 8(b)(4)(ii)(B) of the Labor Management Relations Act, 29 U.S.C. § 158(b)(4)(ii)(B), by picketing businesses that were not primary employers of the Union's members. As the court explains, the statute makes it an unlawful labor practice for a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce," where an object thereof is "forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

It is undisputed that Plaintiffs adequately alleged that the Union threatened, coerced, or restrained the businesses known as the Markets, and that the Markets were not a primary employer. The contested issue is whether the complaint alleged a forbidden object. The complaint did adequately allege that an object of the Union's picketing activity was to force the Markets to cease doing business with suppliers, contractors, and patrons of the Markets. The court concludes that this allegation is insufficient as a matter of law.

---

[4]Because we conclude that the Union's conduct was not prohibited by § 158(b)(4)(ii)(B), we need not consider the Union's argument that its non-picketing media activities constituted conduct entitled to First Amendment protection.

In my view, the complaint adequately alleges a violation of the statute.  The provision is written broadly to forbid actions taken with an object to force "*any person*" (here, the Markets) to cease doing business "with *any other person*" (here, the Markets' suppliers, contractors, and patrons).   As the Supreme Court once observed, "[d]espite criticism from President Truman as well as from some legislators that the secondary boycott provision was too sweeping, the Congress refused to narrow its scope.  Recognizing that 'illegal boycotts take many forms,' Congress intended its prohibition to reach broadly." *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*, 456 U.S. 212, 225 (1982) (citation omitted).  Although the statute "does not speak generally of secondary boycotts," and "describes and condemns specific union conduct directed to specific objectives," *ante*, at 9 (internal quotation omitted), the complaint here alleged specific prohibited conduct taken with a specific prohibited objective.

The court declines to apply the plain language of the statute because it could mean that every picket of a secondary employer is prohibited by § 8(b)(4)(ii)(B).[5]  In support of a narrowing construction, the court relies on *Local 761, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 366 U.S. 667 (1961).  That decision, however, involved picketing against a *primary* employer.  The Court said that the predecessor to § 8(b)(4)(ii)(B), former § 8(b)(4)(A) of the National Labor Relations

---

[5]The court's concern is likely overstated.  Informational or product picketing might well be permitted if it is undertaken with a permissible object or motive. *E.g.*, *NLRB v. Fruit & Vegetable Packers Local 760* (*Tree Fruits*), 377 U.S. 58, 72 (1964); *Lane Crane Serv., Inc. v. Int'l Bhd. of Elec. Workers, Local Union No. 177*, 704 F.2d 550, 553 (11th Cir. 1983); *NLRB v. Holland Am. Wafer Co.*, 683 F.2d 135, 138 (6th Cir. 1982); *NLRB v. Local 825, A, B, C, D, Int'l Union of Operating Eng'rs*, 659 F.2d 379, 384, 387 (3d Cir. 1981).

Act, "could not be literally construed; otherwise it would ban most strikes historically considered to be lawful, so-called *primary* activity." *Id.* at 672 (emphasis added).[6]

The rationale of *Local 761* does not apply to this dispute involving a so-called secondary employer. As the National Labor Relations Board observed when examining the same statute: "But though it is plain that primary action is to be excepted from the scope of Section 8(b)(4)(A), there is nothing in the legislative history to warrant a conclusion that where secondary activity is involved, Congress intended to draw a distinction between different kinds, so as to include some but not others." *Longshoremen, ILA Local 333 (N.Y. Shipping Ass'n)*, 107 N.L.R.B. 686, 711 (1954). Rather, thought the Board, "[t]here is evidence . . . that Congress, with the purpose of confining the area of economic conflict in labor disputes to direct disputants, intended Section 8(b)(4)(A) to condemn all action directed against or which has the effect of injuring the business of third persons not involved in the basic disagreement giving rise to the conflict." *Id.*; *accord Local 272, Iron Workers*, 195 N.L.R.B. 1063, 1063 (1972) (concluding that a union violated § 8(b)(4)(ii)(B) by picketing a neutral employer "with the object of causing a business disruption between it and the subcontractors on the project and any other employer with whom it was doing business," but not with the primary employer who had gone out of business).

The Supreme Court in *Tree Fruits* agreed that "picketing which persuades the customers of a secondary employer to stop all trading with him was . . . to be barred"

_____

[6]*Local 761* addressed a provision of the Taft-Hartley Act of 1947 that included substantially similar language. *See* 29 U.S.C. § 158(b)(4)(A) (1952) (making it an unfair labor practice to "encourage the employees of any employer" to engage in a strike or concerted refusal where an object thereof is "forcing or requiring . . . any employer or other person . . . to cease doing business with any other person."). The current version of § 8(b)(4)(ii)(B) was enacted in 1959. Landrum-Griffin Act, Pub. L. 86-257, § 704, 73 Stat. 542-45 (1959).

by the statute. 377 U.S. at 71. The D.C. Circuit explained well why the prohibition of § 8(b)(4)(ii)(B) is not limited to actions aimed at causing a neutral or secondary employer to cease doing business with a "primary employer" when the statute refers to "any person":

> Although it is frequently true that the object of secondary picketing is to obstruct dealings with the primary employer, Congress did not so limit its language. And a moment's reflection establishes that such a limitation would not have been consonant with the central legislative purpose. That purpose was to confine labor conflicts to the employer in whose labor relations the conflict had arisen, and to wall off the pressures generated by that conflict from unallied employers. If one of the latter could with impunity be forced to suspend its business relations with all persons other than the primary employer, the evil which Congress sought to get at would be complete. Many secondary employers would have no occasion to have commercial intercourse with the primary employers. Is it to be supposed that Congress intended that their businesses could be stopped by secondary pressures simply because of this circumstance? We think not[.]

*Miami Newspaper Pressmen's Local No. 46 v. NLRB*, 322 F.2d 405, 410 (D.C. Cir. 1963); *accord Nat'l Mar. Union v. NLRB*, 346 F.2d 411, 417-18 (D.C. Cir. 1965).

The violation alleged here comes within the plain language of § 8(b)(4)(ii)(B). Judicially created limitations on the plain language that avoid banning "most strikes historically considered to be lawful, so-called primary activity," *Local 761*, 366 U.S. at 672, are not applicable to this dispute. I would therefore reverse the judgment of the district court and remand for further proceedings.

_____

-13-