Pamela GIBSON, Respondent,

v.

Voleta HUMMEL and the Southland Corporation, Appellants.

No. 48216.

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 22, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 26, 1985.

Application to Transfer Denied April 30, 1985.

---

1. We do not decide the issue of submissibility because the majority have sustained the judgment of the trial court in favor of defendant.

Shepherd, Sandberg & Phoenix, Kenneth W. Bean, Stephen J. Potter, St. Louis, for appellants.

Arthur G. Muegler, Jr., St. Louis, for respondent.

CRIST, Judge.

The Southland Corporation (employer) and Voleta Hummel (supervisor) appeal from a judgment awarded Pamela Gibson (employee) on her claims for intentional infliction of emotional distress and violation of the "service letter" statute. The jury awarded employee $125,000.00 actual damages jointly against both defendants, and punitive damages of $400,000.00 against employer, and $30,000.00 against supervisor, on employee's claim for intentional infliction of emotional distress, and actual damages of $5,000.00 against employer for the service letter violation. We reverse.

■ Employer and supervisor challenge submissibility. Employee was an employee at will, and as such could be fired for any or no reason. *Amaan v. City of Eureka*, 615 S.W.2d 414, 415 (Mo. banc 1981); *Ising v. Barnes Hospital*, 674 S.W.2d 623, 625–26 (Mo.App.1984). Employer and supervisor claim that employee only proved wrongful discharge, recovery for which is barred. Employee contends the conduct of defendants, in light of the attendant circumstances, was extreme and outrageous, and intentionally caused emotional distress, under the theory of § 46, Restatement (2d) of Torts (1965). *Pretsky v. Southwestern Bell Tel. Co.*, 396 S.W.2d 566 (Mo. banc 1965). Assuming, without deciding, a case for wrongful discharge may ripen into the tort of outrage, our inquiry is directed to the question of whether employee made a submissible case. We review the evidence in a light most favorable to the verdicts. *Duke v. Gulf & Western Mfg. Co.*, 660 S.W.2d 404, 409 (Mo.App. 1983).

Employer, who owns the registered trade mark "7-Eleven," is the world's largest operator and franchisor of convenience stores. Employee was a full-time clerk in one of these stores, located at the Colonnade Shopping Center in St. Louis County, in supervisor's area. Employee claims the conduct of supervisor and employer, occur-

ring from April 24 to May 4, 1982, when her employment ended, was extreme and outrageous, and intentionally and recklessly caused her severe emotional distress.

The Colonnade Store had experienced severe inventory shortages for several months. Employer was aware inventory shortages, which regularly occurred at its stores, was due to several causes, including errors in accounting, computing, or auditing (counting) inventory, errors or theft by vendors, customer theft, manager errors or negligence, and employee errors, grazing (in-store consumption of items without payment) and theft. A procedure was established to control inventory shortages. It was explained in this procedure that employee theft and grazing accounted for 83% of the total of inventory shortages. Employer's zone manager and district manager, witnesses called by employee, could not substantiate that figure, but did testify, in their experience, employee theft was the major inventory control problem, accounting for more than 50% of shortages. They believed the 83% figure was an industry—wide figure, which they followed as true. The brunt of the inventory control procedure fell on the store managers, who were taught not to trust the employees. Spy techniques were used by the managers to discover the causes of shortages, to preserve their own jobs. Polygraphs were available, but the managers were told that good management was the real answer to their problems.

Supervisor had serious inventory control problems in her stores. Her job performance, rated about seven weeks before employee lost her job, was unsatisfactory, in part because inventory losses in her stores were 1.9% of sales as opposed to a generally allowable 1% of sales. This was also a factor in a demotion of supervisor's immediate superior which occurred after April of 1982.

The Colonnade Store had experienced several months of inventory losses over the allowable limit before April of 1982. An audit on April 15, covering the first 15 days of the month, showed a shortage of $882.00. A second audit, performed eight days later because of the large shortage in the first audit, showed an additional shortage of over $1,200.00. These audits did not reveal the cause of the shortages, or reveal what was missing. After checking the paper work, and discovering no cause of the shortages, supervisor and her immediate superior decided to polygraph the three full-time employees of the store. They had no factual basis to suspect employee of complicity in the shortages.

Employee had worked for employer for over a year. She had received a promotion, several merit raises, and an award from employer. She was an employee at will. On duty when supervisor came into the store right after the audit, employee was told "heads were going to roll." The audit was unacceptable and something was going to be done about it. Employee was indecisive about whether the store manager or anyone else in the store heard this conversation. In a second, later conversation, supervisor again complained about the audit, and stated she believed an employee in the store was stealing, and the full-time employees would have to take polygraph tests or be fired. Again, employee was indecisive as to whether anyone overheard this conversation.

Supervisor selected the polygrapher, and drove the three employees to their location. Employee did not remember signing the consent and release form admitted into evidence, but stated she did not voluntarily consent to take the test. Preliminary questions about employee's drug or alcohol use, bill-paying practices, and whether she was self supporting were highly offensive to her. The small polygraph room made her claustrophobic. The polygraph itself looked like an "octopus" that would shock or electrocute her. She went in and out of consciousness during the test, and was involuntarily tapping her foot and breathing deeply. When asked to stop these movements, she could not do so.

Polygrapher reported the test was inconclusive with signs of deception, and employee had confessed to taking approxi-

mately $100.00 worth of merchandise during her employment. Supervisor confronted employee with this report and gave her the choice of quitting, or being fired and having the police called. Employee denied the charges, and pleaded for more time, but this was not granted. She then "quit."

Employee then consulted a psychiatrist, who diagnosed her as having a major mental disorder arising from the termination and surrounding circumstances. She was alleged to have been susceptible to stress, and described by fellow employees as "nervous," "high strung," "up-tight," "very hyper" and particularly sensitive to work related criticism. It was alleged that defendant knew of this; however, supervisor testified employee did not seem abnormally nervous.

The Supreme Court in *Pretsky* essentially adopted § 46, Restatement (2d) of Torts (1965), providing;

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and if bodily harm to the other results from it, for such bodily harm.

There are three elements of proof:

(1) defendant's conduct must be extreme and outrageous;

(2) defendant acts in an intentional or reckless manner; and

(3) by reason of said acts, plaintiff is caused to suffer severe emotional distress for which severe bodily harm results.

*LaBrier v. Anheuser Ford, Inc.*, 612 S.W.2d 790, 793 (Mo.App.1981); *but see Bass v. Nooney Co.*, 646 S.W.2d 765 (Mo. banc 1983) (modifying the bodily harm requirement).

■ For a plaintiff to recover, a defendant's conduct must have been extreme and outrageous. Comment d to § 46, Restatement (2d) of Torts (1965), delineates the type of conduct which is required:

d. *Extreme and outrageous* conduct. The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Conduct meeting this standard was found in *LaBrier*, where defendant's employees appeared at plaintiff's (wife of former employee) residence, and using a loud and threatening voice harassed and humiliated plaintiff by questioning her as to her husband's whereabouts and threatened to have him arrested, in light of defendant's knowledge of plaintiff's recent hospitalization for emotional problems. *LaBrier*, 612 S.W.2d at 793–94. It has also been held that it can not be said as a matter of law that showing a pornographic movie to a female, claiming it is an educational film, while uttering sexual obscenities to the (non-employee) female, does not constitute outrageous conduct. *Young v. Stensrude*, 664 S.W.2d 263, 265 (Mo.App.1984).

Conduct which has been held not to meet the standard includes; gaining access to a home by use of a false statement and causing anxiety by that statement (*Pretsky*, 396 S.W.2d at 569–70); conveying the information that plaintiff would not be re-employed for the next school year to plaintiff while she was at her doctor's office under sedation, where it is not alleged that defendant knew of that condition, [*Williams v. School District of Springfield R–12*, 447 S.W.2d 256, 265–67 [Mo.1969) ]; transferring a graphic artist to a job as a television camera operator and assigning him an un-

desirable work schedule [*Frye v. CBS Inc.*, 671 S.W.2d 316, 319 (Mo.App.1984)]; insurance company's attempt to settle a wrongful death claim while claimants were in mourning from that death, [*Luster v. Columbia Mut. Ins. Co.*, 624 S.W.2d 890, 892–93 (Mo.App.1981)]; threatening to cut telephone service unless plaintiff pay for cutting an underground line, an action threatened in good faith but erroneous belief of its legality, (*United Tel. Co. of Mo. v. Horn*, 610 S.W.2d 701, 704 (Mo.App. 1980)]; firing an employee who had been informed he would be privately reprimanded for a mistake on the job [*Boyd v. Kansas City Area Transp. Authority*, 610 S.W.2d 414, 415 (Mo.App.1980)]; actions to collect a bill which were a series of letters from the creditor, three phone calls from the creditor, three letters from a collection agency, and three phone calls from that agency, only one of which could be considered abusive [*Smith v. Standard Oil Div. of Amoco Oil Co.*, 567 S.W.2d 412, 416 (Mo.App.1978)]; and a series of phone calls to debtor's employer and a visit to that employer, where employer was momentarily mistaken for debtor, but no one present believed employer was delinquent in payments [*Leonard v. Pioneer Finance Company*, 568 S.W.2d 937, 941–43 (Mo.App. 1978)].

■ Employee urges the conduct of employer and supervisor in requiring employee to take the polygraph and involuntarily terminating her employment amounted to outrageous conduct. However, there is insufficient evidence to show this conduct went "beyond all possible bounds of decency" or was "atrocious, and utterly intolerable in a civilized community," as is required for recovery. *Frye*, 671 S.W.2d at 319. Employee, who was an employee at will, could be fired for no reason at all, and could be required to submit to a polygraph examination as a condition of continued employment. *Ising*, 674 S.W.2d at 626.

■ Requiring a polygraph was not so unreasonable as to be actionable. There is no dispute over the seriousness of the inventory shortages. Employee established

more than one-half of inventory shortages were due to employee theft. It was not unreasonable for employer to take steps to halt the shortages. Employee also does not dispute that polygrapher reported to supervisor and employer employee's alleged confession of stealing $100.00 worth of merchandise. While employer's and supervisor's conduct would have been sufficient for wrongful discharge, not actionable in Missouri, such conduct fell short of being so extreme and outrageous as to be actionable.

■ There is also insufficient evidence to support a finding employer and supervisor acted intentionally or recklessly to cause emotional distress. Employee's evidence concerning the discussions about the shortages, taking place in the store between employee and supervisor, did not show any intentional or reckless misbehavior on the part of supervisor, especially in light of the lack of evidence of any intent to injure, or that they were overheard by any identifiable third party. Even if it were established, any recklessness involved here would not help in showing reckless or intentional conduct in requiring the polygraph or in firing employee. In short there was insufficient evidence to elevate this case from one of wrongful discharge to one of outrage. See *Ledl v. Quik Pik Food Stores, Inc.*, 133 Mich.App. 583, 349 N.W.2d 529, 532–33 (1984); *Todd v. South Carolina Farm Bureau Mut. Inc.*, 321 S.E.2d 602 (S.C.App.1984); *Food Fair, Inc. v. Anderson*, 382 So.2d 150 (Fla.App.1980); contra. *Smithson v. Nordstrom, Inc.*, 63 Or.App. 423, 664 P.2d 1119 (1983) (prolonged interrogation without evidence of wrongdoing, culminated by a coerced confession of theft and a termination of the employee); *Bodewig v. K-Mart Inc.*, 54 Or. App. 480, 635 P.2d 657 (1981) (clerk strip searched for twenty dollars); *M.B.M. Co., Inc. v. Counce*, 596 S.W.2d 681 (Ark.1980) [conduct (employee forced to take polygraph, part of last check was withheld to cover part of a cash shortage, and employer lied to unemployment compensation au-

thority) held actionable when it occurred after employee-at-will was terminated.]

Employer also attacks the recovery on employee's claim of a violation of the "Service Letter" statute, § 290.140 RSMo 1978, on the ground there was insufficient evidence of damages to support a recovery. Actual damages in a service letter case are proven by showing (1) plaintiff was refused or hindered in obtaining employment, (2) due to the absence or inadequacy of a service letter, (3) the position plaintiff was refused or was hindered in obtaining was actually open, and (4) the rate of pay of that position. *Herberholt v. dePaul Com. Health Center*, 625 S.W.2d 617, 622–23 (Mo. banc 1981). Employee did not meet the elements of proof. She testified she applied for, but did not get, three jobs. All of these jobs were applied for before she requested a service letter from employer. There is no showing the contents of or absence of this service letter affected her chances for any of these jobs, that any of them were open, or their rate of pay. Therefore, the judgment for damages on the service letter claim must be reversed as well.

The judgment for intentional infliction of emotional distress in the amount of $125,000.00 actual damages against both defendants jointly, punitive damages of $400,000.00 against employer and punitive damages of $30,000.00 against supervisor is reversed. The judgment against employer for violation of the Missouri Service Letter Statute in the amount of $5,000.00 is reversed.

DOWD, P.J., and CRANDALL, J., concur.