# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 15-2968

———————————————

Grace Gillis

*Plaintiff - Appellant*

v.

The Principia Corporation, doing business as Principia College

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

——————————

Submitted: June 14, 2016
Filed: August 10, 2016

——————————

Before SMITH and GRUENDER, Circuit Judges, and KETCHMARK,[1] District
Judge.

——————————

SMITH, Circuit Judge.

Grace Gillis brought suit against The Principia Corporation, doing business as
Principia College ("Principia"), asserting (1) breach of contract, (2) intentional

———————————————

[1]The Honorable Roseann A. Ketchmark, United States District Judge for the
Western District of Missouri, sitting by designation.

infliction of emotional distress (IIED), (3) negligent infliction of emotional distress (NIED), and (4) negligence under Missouri law. These claims arose from events that occurred during Gillis's time as a student at Principia. The district court[2] granted Principia's motion to dismiss Gillis's complaint for failure to state a claim. On appeal, Gillis argues that the district court erroneously (1) dismissed her breach-of-contract claim based on its improper characterization of the claim as "educational malpractice," (2) concluded that she failed to plead the essential elements of IIED, and (3) found that she failed to demonstrate facts plausibly demonstrating an unreasonable risk of emotional distress on her NIED claim. We affirm.

## I. *Background*[3]

Gillis is a graduate of Principia, an accredited private, coeducational four-year liberal arts and science college for Christian Scientists, located in Elash, Illinois. Gillis attended Principia from August 2009 through May 2013. "Principia promised certain standards . . . and promised to help [Gillis] with various aspects of her life." Additionally, it "promised that disputes would be resolved according to certain procedures." Gillis chose to attend Principia because of these representations.

While attending Principia, Gillis clashed with a music professor who taught a required course for Gillis's music major. Gillis felt that the professor "was becoming exceedingly hostile toward her as the term progressed." Gillis sought to resolve the conflict pursuant to the "Matthew Code," the Principia community's prescribed dispute-resolution method. "'The Matthew Code' dictates that when one person has a conflict with another, the concerned person is to speak privately with the other, in an

---

[2]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

[3]The following facts are taken from Gillis's Third Amended Complaint and are taken as true for purposes of a motion to dismiss. *Wolfchild v. Redwood Cty.*, No. 15-1580, 2016 WL 3082341, at *2 (8th Cir. June 1, 2016).

effort to resolve the conflict." If the parties are unable to resolve the conflict privately, then "the concerned person is to increasingly bring other community members into the conversation until it is resolved." Principia's student handbook explains this conflict-resolution standard. "Principia base[s] its version of the 'Matthew Code' in religious texts," but Gillis maintains that "it is a standard that could be very easily applied by secular institutions."

Gillis expressed to the professor her belief that he was hostile towards her and that she feared him. In response, the professor told Gillis that "the relationship between a professor and a student is a professional relationship, and it should stay that way." He also stated that "this makes sense why you're always around my office." Based on the professor's comments, Gillis "believed that her professor had somehow construed [her] conduct as some sort of romantic advance." Gillis had no romantic interest in the professor.

Gillis alleges that the professor (1) angrily yelled at Gillis with harsh language, (2) slammed doors when leaving Gillis, (3) threatened Gillis's grade when she asked questions about exam formats or questions, (4) refused to help Gillis find ways to learn the course material more effectively, (5) openly mocked Gillis as a "slow learner" after Gillis received a poor grade, (6) consistently talked over Gillis and denied her any opportunity to speak when meeting over academic issues with her and other students, (7) told Gillis that she should withdraw from his course after Gillis asked for applied examples of a theory referenced in the professor's lectures, and (8) became agitated with Gillis when she asked him to clarify what she said that offended him.

In an attempt to resolve her difficulties with the professor, Gillis sent the professor an e-mail in which she requested another in-person meeting. At that meeting, although Gillis perceived the professor as being "agitated or uneasy," she felt that "any issues and misconceptions were laid to rest." At no time during the meeting

did the professor mention excluding her from the course. Winter break arrived, and five weeks elapsed with no contact between Gillis and the professor.

When Gillis returned from winter break, relations with her professor were still tense. Gillis asked the professor for help with the course material, and the "professor resorted to the harassing behavior described above." Gillis then wrote her professor a letter to explain that she was not attacking his character or authority position. "Thereafter, with no warning, [Gillis] was excluded from a music-major required course by . . . this professor, preventing [Gillis] from completing a music-major."

Gillis maintains that her exclusion from the class "was decided with disregard toward, and in violation of Principia rules, regulations and policies." Prior to her exclusion from the course, Gillis was not advised in writing. The professor removed her from the course because the "personal feelings" that Gillis expressed in the letter had made the professor uncomfortable having Gillis in class. This reason was given to Gillis "[d]espite the fact that the rules, policies, and procedures concerning exclusion from a course only refers to academic or student-life related infractions in its examples for when exclusions may be implemented." "[T]he professor refused to engage in any dialogue to explain why he had excluded [Gillis] or to resolve the misunderstanding." Gillis claims that the professor's conduct "broke Principia's rules concerning proper procedure of exclusion from a course." The Principia administration told Gillis that she would be suspended from Principia if she attempted to communicate with the professor.

Thereafter, Gillis applied to take the music course from another professor, but her petition was denied. Gillis claims that both the Dean of Academics and the Dean of Students refused to address her situation and that although the Director of Human Resources did meet with her, that individual "was dismissive, uncooperative, and verbally abusive toward [her]." Because her request to enroll in another music class was denied, Gillis was unable to complete a major in music.

Gillis maintains that Principia's conduct "breached the procedures represented in the student handbook about how such situations should be addressed." She asserts that even if she had committed an academic or student-life infraction,

> Principia breached contractual agreements based in the student handbook concerning how such infractions are to be addressed. Specifically, Principia did not inform Plaintiff in writing before her exclusion, did not allow Plaintiff to talk with her professor, did not bring Plaintiff to the Restorative Justice Committee,[4] did not convene a circle,[5] did not allow Plaintiff to tell her side of the story, and did not bring Plaintiff in front of the Community Board[6] in order to address any perceived infractions.

In addition to wanting to meet with Principia administrators and staff to discuss her exclusion from the music course, Gillis contends that she attempted to meet with them "to explain her existing health concerns and how she felt that being part of the Music Department gave her a much needed sense of community and support, especially in her time of need." Gillis "convince[d] herself that she was suffering from a possible terminal illness" based on her symptoms of the "vomiting of blood and

---

[4]"Principia's Restorative Justice Committee existed to 'help both the offender and those affected to talk with each other about why the offense happened, what harm was done to individuals and the community, and the reason for the standard.'" (Quoting 2011–2012 Principia Student Catalog, at 12–13.)

[5]"If an issue was referred to the Restorative Justice Committee, a group of individuals were to come together and support affected individuals. This group is generally referred to as 'the circle.'" The purpose of the circle is to inform the accused of the alleged offenses against him or her and guarantee the accused the opportunity to speak on his or her behalf. The circle determines a "reparation plan."

[6]If the circle recommends suspension, or if the offender fails to complete the reparation plan, then the case proceeds to the Community Board. "The Community Board consisted of Principia College Community members (*i.e.*, students, faculty, and staff), all of whom receive training in the judicial process and standards of evidence."

other fluids, passing out of consciousness for periods of time, the inability to see for periods of time, extreme exhaustion, dizziness, chest pain, the inability to breathe properly, lack of appetite, migraines, abdominal pain, and uncontrollable shaking." Also, Gillis "had confided in Principia staff, faculty, and administration that she had an abusive childhood, with which she was still struggling to deal with." Gillis claims that "Principia knew that it was dealing with an extremely fragile individual" and knew "that [Gillis] believed that she had a possible terminal illness." Principia's knowledge of Gillis's condition is based on her repeated attempts "to explain her situation to Principia, both verbally and in writing" and her plea "for support to alleviate the physical symptoms that she described." According to Gillis, "Principia ignored [her] cries for help" or "ridiculed [her] feelings." Gillis maintains that Principia's behavior caused her to have difficulty concentrating on routine tasks, "weep for hours each day," lose "nearly all enjoyment in life," feel agitated around others, feel extreme fatigue, and experience insomnia.

According to Gillis, "Principia did not call 9-1[-]1, contact on-campus or nearby Christian Science nurses or Christian Science nursing facilities, or contact nearby medical institutions" in response to her cries for help despite its "Emergency Response Program."[7] Nor did Principia contact Gillis's parents about her health despite its "Parental Notification" policy.[8] Additionally, Gillis asserts that Principia failed to follow its "Get Help When There is Immediate Danger" policy.[9]

---

[7]According to Gillis, that policy "dictated . . . procedures for every case of a health or injury emergency," such as "[c]all[ing] [a] Christian Science nurse," "[c]all[ing] a Christian Science practitioner for a Christian Scientist," [c]alling Campus Security," and "[c]alling 9-911 (Police)." In addition, the policy provides "General Information & Instruction" concerning first aid and CPR, notification of accidents and injuries, and transportation to care facilities.

[8]Gillis fails to set forth the terms of this policy in her complaint.

[9]That policy provides:

Based on these events, Gillis filed suit against Principia, alleging breach of contract and negligence under Missouri law. Thereafter, Gillis filed her Second Amended Complaint, which added the additional claims of IIED and NIED. Principia moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Principia argued that the claims set forth in Gillis's Second Amended Complaint are noncognizable claims for educational malpractice and that Gillis failed to adequately allege the outrageous-conduct and sole-intent elements necessary for her IIED and NIED claims. The district court agreed and granted Principia's motion to dismiss the complaint without prejudice. The court gave Gillis leave to amend her complaint to cure the identified deficiencies.

After Gillis submitted her Third Amended Complaint, the court found that Gillis's new allegations failed to cure the deficiencies identified in the court's order dismissing the Second Amended Complaint. As a result, the court dismissed the Third Amended Complaint with prejudice.

---

If a community member is aware of circumstances that threaten someone's immediate well-being, he or she should act to prevent harm and, if necessary, get help. Confidentiality is outweighed by the need to get help. Suicidal talk, eating disorders, other health risks, fights, recklessness, drug dealing, hazing, hate acts, child abuse, and possession of a lethal weapon are examples of situations that should be immediately reported to a resident counselor or the dean of students (ext. 5162). For the quickest response of nursing care, call Cox Cottage first (ext. 5000), and then 911 if an ambulance is needed. If there is an armed attack or any other case that needs an immediate armed response from the police, call 911 first and then the Gate House (ext. 5111).

## II. *Discussion*

On appeal, Gillis argues that the district court erred in dismissing her breach-of-contract, IIED, and NIED claims.[10] We review de novo a district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Wolfchild*, 2016 WL 3082341, at *2. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quotations and citations omitted). A district court's dismissal of a complaint "is appropriate only when there is no dispute as to any material facts and the moving party is entitled to judgment as a matter of law." *Id.* (quotation and citations omitted).

## A. *Breach of Contract*

Gillis argues that the district court erroneously construed her breach-of-contract claim as one for educational malpractice, which is not a cognizable claim in Missouri. She contends that the district court "ignored the vast majority of [her] allegations and focused on only a few allegations which it conveniently categorized as aspirational or religious in nature." She maintains that she adequately set forth in her Third Amended Complaint the mutual promises set forth in the student handbook that form the basis of her breach-of-contract claim.

For Gillis to state a claim for breach of contract under Missouri law, she "must establish the existence of a valid contract, *the rights of plaintiff and obligations of defendant under the contract*, a breach by defendant, and damages resulting from the breach." *Lucero v. Curators of Univ. of Mo.*, 400 S.W.3d 1, 5 (Mo. Ct. App. 2013) (quotation and citation omitted). Therefore, Gillis must "identify which rights or

---

[10]In her opening brief, Gillis includes no argument about the district court's dismissal of her freestanding negligence claim. "[A]rguments not raised in an initial brief are waived." *Hernandez v. Holder*, 760 F.3d 855, 863 (8th Cir. 2014) (citation omitted).

obligations [Principia] breached under the contract in order to establish a claim for breach of contract." *See id.* "[A]n educational institution's brochures, policy manuals and other advertisements may form the basis of a legally cognizable contractual relationship between [a university] and its students." *See id.* (quotation and citation omitted). In order for Gillis to state a cognizable breach of contract claim against Principia, she "must point to an identifiable contractual promise that [Principia] failed to honor." *See id.* (quotation and citations omitted).

But "[n]ot every dispute between a student and a university is amenable to a breach of contract claim." *Id.* (alteration in original) (quotation and citation omitted). "Generally, courts have refrained from recognizing educational malpractice claims, either in tort or contract, on the premise that '[u]niversities must be allowed the flexibility to manage themselves and correct their own mistakes.'" *Id.* at 8 (alteration in original) (quoting *Miller v. Loyola Univ. of New Orleans*, 829 So.2d 1057, 1061 (La. Ct. App. 2002)). "Missouri . . . has found that educational malpractice claims are not cognizable because there is no duty." *Dallas Airmotive, Inc. v. FlightSafety Int'l, Inc.*, 277 S.W.3d 696, 699 (Mo. Ct. App. 2008) (citations omitted). "In refusing to recognize a claim for educational malpractice, [Missouri courts have] emphasized that it is not [the court's] place to micromanage a university's daily operations." *Lucero*, 400 S.W.3d at 8 (citing *Dallas Airmotive*, 277 S.W.3d at 700). A breach-of-contract claim that "'raises questions concerning the reasonableness of the educator's conduct in providing educational services' . . . 'is one of educational malpractice,' which Missouri courts have recognized as a non-cognizable claim." *Id.* (quoting *Dallas Airmotive*, 277 S.W.3d at 700).

To determine whether Gillis has stated a breach-of-contract claim, we must necessarily identify the promises that Gillis relies upon and determine whether these purported promises create rights and obligations on Principia's behalf. *See id.* at 5.

This is no easy task, as Gillis's complaint contains scattershot allegations. We therefore must create order from chaos.[11]

---

[11]At oral argument, the court inquired where it could locate the promises that Principia breached, Gillis's counsel replied:

> With regard to the record, we have alleged that in the breach of contract in various paragraphs in the Third Amendment Complaint . . . . And, to your point, with regard to the specificity that is required, not at the pleading stage, but later on, perhaps when we get to the summary-judgment stage, that's the purpose of discovery. We can't possibly—it's impossible for us to articulate every single point where these promises arise. Why? Because, one, that's not what [Federal] Rule [of Civil Procedure] 8 says that we're supposed to do. There is no such requirement. We understand that there is . . . a plausibility standard . . . , but there is no specific requirement to identify a precise legal standard. There is no requirement for the appellant to establish a prima facie case.

But a plaintiff does not get to wait until discovery to identify what promises the defendant has breached. "In breach of contract actions, . . . the complaint must, at minimum, cite the contractual provision allegedly violated. Generalized allegations of a contractual breach are not sufficient." *Cummins Law Office, P.A. v. Norman Graphic Printing Co.*, No. CIV. 11-2061 RHK/FLN, 2012 WL 3430447, at *3 (D. Minn. Aug. 14, 2012) (alterations in original) (quoting *Otani v. State Farm Fire & Cas. Co.*, 927 F. Supp. 1330, 1335 (D. Haw. 1996)). In other words, the plaintiff "must plead enough facts, if true, that 'show' it is entitled to relief." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). Thus, a complaint "fails to state a claim for breach of contract [if] it does not set out [the claimant's] rights or [the defendant's] obligations under the contract." *Trotter's Corp. v. Ringleader Rests., Inc.*, 929 S.W.2d 935, 941 (Mo. Ct. App. 1996)). "Vague references to unspecified 'agreements' are insufficient to state a claim for breach of contract." *Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 884 (E.D. Mo. 2013) (citations omitted).

We identify the following provisions in the Third Amended Complaint as the sources of the purported promises that Principia made to Gillis: (1) the Matthew Code, (2) Student Catalog provisions requiring notice prior to exclusion from class and presentation before the Restorative Justice Committee, the circle, and Community Board; (3) Principia's "Get Help When There is Immediate Danger" policy; (4) Principia's "Health or Injury Emergency Response Program"; and (5) Principia's "Parental Notification" policy. We conclude that none of the purported "promises" contained in these sources are sufficient to state a claim for breach of contract under Missouri law.

First, we conclude that the Matthew Code is "aspirational in nature" and therefore cannot serve as the basis for Gillis's breach-of-contract claim. *See Lucero*, 400 S.W.3d at 6. Gillis contends that "'[t]he Matthew Code' dictates that when one person has a conflict with another, the concerned person is to speak privately with the other, in an effort to resolve the conflict." Gillis admits that "Principia based its version of the 'Matthew Code' in religious texts"—unquestionably, the religious text that Gillis is referring to is Matthew 18:15–17.[12] The Matthew Code and the scriptural

---

After the court advised Gillis's counsel that Gillis does not "get to wait until discovery to identify what promise was breached" and again asked "what promise was breached," Gillis's counsel responded, "The promise that if you meet certain criteria, you are going to be enrolled in a class, and we are not going to exclude you from that class." Counsel argued that Gillis was entitled to notice prior to her exclusion from the class.

[12]Matthew 18:15–17 provides:

If your brother sins, go and show him his fault in private; if he listens to you, you have won your brother. But if he does not listen to you, take one or two more with you, so that by the mouth of two or three witnesses

-11-

passages embodied therein "do not amount to specific, discrete promises made by [Principia]." *See Lucero*, 400 S.W.3d at 7. The Matthew Code does not set forth "objective or quantifiable promises made by [Principia]." *See id*. Instead, the Matthew Code embodies "general promises pronouncing [Principia's] intent to maintain an ethical environment for its faculty and students" by setting forth principles of how to resolve conflict. *See id*. These "aspirational" promises, *see id*. at 6, "cannot form the basis of a breach of contract claim." *See id*. at 7.

Second, the Student Catalog provision requiring notice prior to exclusion from class cannot serve as the basis for Gillis's breach-of-contract claim because it is inapplicable to her. In her opening brief, Gillis concedes that Principia's exclusion policy provides that

> a student may be excluded *with an F* from a class for reasons including, but not limited to, non-attendance, plagiarism, or cheating. Before excluding the student from class, the instructor will inform the student in writing of the reason for the exclusion and allow the student to respond. A copy of the letter will be sent to the Scholastic Committee. (Emphasis added.) (Quotations omitted.)[13]

Gillis's Third Amended Complaint does not allege that she was excluded from the music course "with an 'F.'" As a result, the plain terms of Principia's exclusion

---

> every fact may be confirmed. If he refuses to listen to them, tell it to the church; and if he refuses to listen even to the church, let him be to you as a Gentile and a tax collector.

The Holy Bible, Matthew 18:15–17 (New American Standard Bible).

[13]In her Third Amended Complaint, Gillis sets forth only the second full sentence of the above-quoted passage.

policy does not apply to Gillis's exclusion from the music course because her exclusion did not result in her receiving an "F."

Nor are the provisions discussing a student's presentation before the Restorative Justice Committee, the circle, and the Community Board applicable to Gillis based on the allegations contained in her complaint. Gillis's Third Amended Complaint provides that "Principia's Restorative Justice Committee existed to 'help both the *offender* and those affected to talk with each other about why the *offense* happened, what harm was done to individuals and the community, and the reason for the standard.'" (Emphases added.) (Quoting 2011–2012 Student Catalog, at 12–13.) Thus, a student's presentation before the Restorative Justice Committee and potential presentation before the circle and the Community Board are *disciplinary* procedures. Nowhere in Gillis's complaint does she allege that Principia disciplined her following her exclusion from the music class or what offense resulted in the discipline.[14]

Finally, Principia's "Get Help When There is Immediate Danger" policy, "Health or Injury Emergency Response Program," and "Parental Notification" policy as set forth in Gillis's Third Amended Complaint do not contain "rights or obligations" of Principia, *see Lucero*, 400 S.W.3d at 5; instead, they contain general guidance on what a "community member" should do in an emergency situation. As to the "Parental Notification" policy, Gillis has failed to identify any language in that policy conferring a duty on Principia to notify her parents.

---

[14]The exclusion itself cannot be characterized as "discipline." Gillis's Third Amended Complaint does not allege that Principia guaranteed her the right to take and complete a particular class or receive a particular major. And, as previously noted, Gillis does not allege that she received an "F" as a result of the exclusion.

In summary, we hold that Gillis has failed to state a claim for breach of contract because none of the policies and provisions that Gillis identifies in her Third Amended Complaint create obligations that Principia owed to Gillis. *See id.*

## B. *IIED*

Gillis next argues that the district court erred in dismissing her IIED claim because she adequately "pleaded she was subjected to a continued campaign of tortious conduct inflicted by [Principia], through its faculty and staff . . . in a clear position of authority over [her]."

> To state a claim for intentional infliction of emotional distress, a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly causes severe emotional distress that results in bodily harm. *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. banc 1996). The conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Warrem v. Parrish*, 436 S.W.2d 670, 673 (Mo. 1969). The conduct must be "intended only to cause extreme emotional distress to the victim." *K.G.*, 918 S.W.2d at 799.

*Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (en banc); *see also Gibson v. Hummel*, 688 S.W.2d 4, 7 (Mo. Ct. App. 1985) ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" (quotation and citation omitted)).

Under Missouri law, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery." *St. Anthony's Med. Ctr. v. H.S.H.*, 974 S.W.2d 606, 611 (Mo. Ct. App. 1998) (citation omitted). "Missouri case law reveals very few factual scenarios sufficient to support a claim for intentional infliction of emotional distress." *Kan. City Laser, Inc. v. MCI Telecomms. Corp.*, 252 F. App'x 100, 104 (8th Cir. 2007) (unpublished per curiam) (quotation and citation omitted). In Missouri, it is a rare occurrence when "a defendant's conduct [is] sufficiently extreme and outrageous to warrant recovery." *Id.* (citing *Hummel*, 688 S.W.2d at 7–8 (listing cases where Missouri courts have *not* found conduct alleged to inflict emotional distress to be extreme and outrageous)).

Here, as recounted *supra*, Gillis alleges in her Third Amended Complaint that the music professor yelled at her, excluded her, ignored and threatened her, and refused to engage with her. She also alleges that some of Principia's administrators and staff ignored her, yelled at her, refused to meet with her, and threatened her with suspension if she persisted in challenging her exclusion from class.

The allegations set forth in Gillis's complaint detail, at most, "insults, indignities, threats, annoyances, petty oppressions, or other trivialities" to which "[l]iability for IIED 'clearly does not extend.'" *Bailey v. Bayer CropScience L.P.*, 563 F.3d 302, 310 (8th Cir. 2009) (quoting *Pretsky v. Sw. Bell Tel. Co.*, 396 S.W.2d 566, 569 (Mo. 1965)). They are comparable to that class of cases that the Missouri courts have held failed to meet the high standard for extreme and outrageous conduct. *See, e.g.*, *Morris v. Union Pac. R.R.*, 825 S.W.2d 911, 916 (Mo. Ct. App. 1992) (holding that plaintiff's evidence that his various supervisors threatened to fire him, laughed at a cartoon depicting him, watched him too closely, placed him on jobs for which he had no experience, and allowed him to be absent from work but then complained to him about his absenteeism, was insufficient to permit recovery on a claim of intentional infliction

of emotional distress); *Hendrix v. Wainright Indus.*, 755 S.W.2d 411, 412 (Mo. Ct. App. 1988) (holding that plaintiff who alleged that he was "continuously harassed and threatened with termination" in retaliation for filing a complaint with the Occupational Safety and Health Administration could not prevail on an IIED claim because the defendant's conduct was not outrageous, although it was "undesirable" and "illegal"); *Comstock v. Consumers Mkts., Inc.*, 953 F. Supp. 1096, 1106 (W.D. Mo. 1996) (holding that plaintiff's claims that the epithet "bitch" was written on her time card, and that her supervisor held her responsible for duties she did not believe were hers, compared her legs to those of a coworker, stated that women were meant to be subject to men, and frequently criticized her work, were "insensitive and unkind, but not outrageous").

Therefore, we hold that the district court did not err in dismissing Gillis's IIED claim.

## C. *NIED*

Finally, Gillis argues that the district court erred in dismissing her NIED claim. According to Gillis, her Third Amended Complaint sets forth allegations plausibly demonstrating an unreasonable risk of emotional distress.

> To state a claim of negligent infliction of emotional distress [under Missouri law], appellant was required to plead: (1) appellees realized or should have realized that their conduct involved an unreasonable risk of causing distress; and (2) appellant suffered emotional distress or mental injury that is medically diagnosable and sufficiently severe to be medically significant.

*Gordon v. City of Kansas City*, Mo., 241 F.3d 997, 1004 (8th Cir. 2001) (citing *Brewer*, 952 S.W.2d at 248–49).

While Gillis alleges that her condition was "severe," she does not allege that her "emotional distress or mental injury . . . is medically diagnosable," which is required under Missouri law to state a NIED claim. *See id*. For that reason, the district court properly dismissed her NIED claim.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____